**COPPER LIQUOR, INC., et al., Plaintiffs,**

**Robert Earl Basham, Jr., H. A. Anthony and Anthony and Willis Ray Loving, Executors of the Estate of Harold Letcher, Deceased, Plaintiffs-Appellees Cross-Appellants,**

v.

**ADOLPH COORS COMPANY, Defendant-Appellant Cross-Appellee.**

**No. 78–3209.**

United States Court of Appeals, Fifth Circuit.

Aug. 20, 1980.

Rehearing Denied Oct. 16, 1980.

Bradley, Campbell & Carney, Leo N. Bradley, Earle D. Bellamy, II, Golden, Colo., for defendant-appellant cross-appellant.

James R. Warncke, San Antonio, Tex., for plaintiffs-appellees cross-appellants.

Before WISDOM, FAY and TATE, Circuit Judges.

WISDOM, Circuit Judge:

In this appeal we consider for the second time the Sherman Act suit brought by Harold Letcher[1] against the Adolph Coors Company. Letcher initiated this action in March 1970 to recover damages that allegedly resulted when a Coors distributor, Coleman Distributing Company, refused to sell Coors beer to Letcher's store. A jury found Coors liable to the plaintiff under section 1 of the Sherman Act, 15 U.S.C. § 1, and the district court awarded damages and attorneys' fees.[2] In 1975 this Court upheld the district court's finding of Sherman Act liability, but remanded the case "for further proceedings (1) to determine whether the violation caused Letcher injury, and, (2) if so, to determine damages . . .". *Copper Liquor Inc. v. Adolph Coors Co.*, 5 Cir. 1975, 506 F.2d 934, 936, *rehearing denied*, 509 F.2d 758.

On retrial the jury found that Coors's antitrust violation caused the plaintiff's injury and awarded damages in the amount of $15,000. The district court awarded the plaintiff treble damages, as required by section 4 of the Clayton Act, 15 U.S.C. § 15, plus $45,000 in attorneys' fees. Both parties appealed. Coors argues that the evidence does not support the jury's finding of injury to the plaintiff or resultant damages. The plaintiff contends that the damages and attorneys' fees were grossly inadequate. We find that sufficient evidence supports the district court's damage award, but remand the case for reconsideration of the amount of reasonable attorneys' fees

appropriate to counsel for the prevailing party.

I.

The evidence presented in the first trial showed that Letcher began operating a retail liquor store as a sole proprietorship in Brownwood, Texas, in January 1966. At about the same time, Coors entered the Brownwood market. Letcher began purchasing Coors for his store on January 24, 1966. On several occasions Letcher advertised Coors at a discount and sold the beer as a "loss leader". Coleman, the exclusive Coors distributor in the Brownwood area, informed Letcher that he would discontinue deliveries of Coors to the store unless Letcher would promise not to offer the beer at a discount. Letcher did not comply with Coleman's request and again advertised Coors at a discount. As a result, Coleman ceased deliveries of Coors on June 3, 1966. No Coors was sold at the store from late June 1966 until July 17, 1971, the date Ralph and Henrietta Williams became the sole owners of the store.[3]

Letcher filed suit against Coors alleging that Coors conspired with its distributors to fix the retail price of beer and to discontinue supplying Coors beer to him. Letcher's complaint also charged Coors with conspiring to create and enforce exclusive territories within which each distributor was to conduct its business thereby making it impossible for Letcher to obtain Coors from another distributor after he was unable to buy from Coleman. Letcher attempted to prove injury and damages by showing that his store's sales declined after Coleman stopped delivering Coors. Letcher and

1. Mr. Letcher died while the first appeal of this case was pending in this Court. His executors were substituted as plaintiffs. *Copper Liquor, Inc. v. Adolph Coors Co.*, 5 Cir. 1975, 506 F.2d 934, 936 n.1, *rehearing denied*, 509 F.2d 758.

2. In the first trial the district court trebled the jury's $101,011 damage award to $303,033 and awarded $75,000 attorneys' fees.

3. Letcher operated the store from January 1, 1966, through December 31, 1966, as a sole proprietorship. On January 1, 1967, he sold a one-half interest in the store to Mr. and Mrs. Williams. On September 1, 1967, Letcher and Mr. and Mrs. Williams incorporated the business and became the sole shareholders. Letcher sold his interest in the corporation to Mr. and Mrs. Williams in July 1971. Mr. and Mrs. Williams dissolved the corporation and reopened the store as a sole proprietorship.

Henrietta Williams, a clerk and later part owner of the store, testified that the store reduced its markup on all items from 25 percent to 15 percent to attract business that would compensate for diminished sales caused by the loss of Coors. The jury found that Coors had enforced territorial restraints and fixed prices in violation of section 1 of the Sherman Act and assessed Letcher's damages at $101,011.

We upheld the finding of a Sherman Act violation, but concluded that the record did not support the jury's findings of injury in fact and damages attributable to Coors's policies of price-fixing and territorial restrictions. *Copper Liquor, Inc.*, 506 F.2d at 953; 509 F.2d at 759. The documentary evidence of Letcher's damages, which consisted almost exclusively of the store's gross bank deposit records, did not show that sales declined after July 1966 and did not support Letcher's contention that he reduced his markup on all goods after Coleman stopped delivering Coors. Of critical importance to our conclusion that no injury in fact was shown was Letcher's admission that he sold all Coors beer at an overall loss. *Id.* at 952. We remanded the case for the plaintiff to prove injury in fact and damages.

At the second trial, the plaintiff introduced the testimony of Henrietta Williams and J. Kenneth Green. The parties stipulated that the plaintiff purchased 1,211 cases of Coors beer between January 24, 1966 and June 3, 1966. Mr. Williams stated that the store purchased this beer from Coors for $4.00 and $4.10 a case.[4] Usually

the beer was sold for $5.10 or $5.20 a case at a gross profit of $1.00 per case. On three weekends, however, the store advertised and sold Coors at a discount of $3.99 a case in an effort to increase its sales of other items. About 225 cases of Coors were sold below cost during these weekend sales.[5] According to Mrs. Williams's testimony, the store sold Coors at the rate of about 250 cases a month or $250. The plaintiff had no Coors beer from June 1966 until he went out of business on July 17, 1971, a period of 60 months. The jury's verdict of $15,000 is exactly 60 times $250.

Mrs. Williams again testified that after the deliveries of Coors stopped, the store's total sales declined. To attract more business the store reduced its markup on all items from 25 percent to 15 percent. The plaintiff failed in the second trial, as in the first, to produce documentary evidence that confirmed Mrs. Williams's statements that the store reduced its markup on all goods by 10 percent.

The testimony of the plaintiff's expert, certified public accountant Kenneth Green, concerned the loss of profit and loss of goodwill caused by Coors antitrust violation. Green based his testimony on incomplete business records that consisted of the store's bank statements and income tax returns for the years 1966 through 1971. Green stated that the store's 1966 profits were depressed by $10,569 as a result of the 10 percent markdown.[6] He testified that the diminished profits from 1967 to 1971 attributable to the 10 percent reduction of markup approached $90,000.[7] Green based

4. A case of 24 twelve oz. bottles of beer cost $4.00; a case of four six-pack bottles and cans cost the store $4.10.

5. The plaintiff did not introduce any business records corroborating Mrs. Williams's recollection of the cost and sales price of Coors beer.

6. By examining the store's beginning and ending inventories for the year 1966, Green was able to determine the markup on all goods sold during that year. Because the store kept no monthly inventories, however, Green was not

able to ascertain whether the store reduced its markup from 25 percent to 15 percent after the loss of Coors.

7. Green determined the markup on goods sold from 1967 to 1971 by comparing the store's gross profits to sales as listed on the store's corporate income tax returns. He then computed the profit that would have been made in each year had the store used a 25 percent markup. His calculations were as follows:

his calculations, however, upon the assumption that the store reduced its markup in 1966. He was not able to verify a 10 percent reduction in markup by examining the store's business records. Green also calculated the store's loss of goodwill [8] attributable to Coors's antitrust violation. He said the store would have had a goodwill value of $109,900 had Letcher continued to mark up its goods by 25 percent during the years 1967 through 1971. The goodwill value of the store based on its actual net profits from 1967 to 1971 was supposedly only $18,-145.[9]

Coors introduced the testimony of Stuart Coleman, its Brownwood, Texas distributor, and Wayne A. Peters, an accountant. Coleman testified as to the competitive nature of the retail liquor market in Brownwood; his testimony did not bear on the question of the plaintiff's damages. Peters analyzed Letcher's tax returns for the years 1966 through 1971. He computed the net income generated by the store by adjusting personal and corporate tax returns to compensate for the change in the store's operation from a proprietorship to a partnership to a corporation. Coors showed through Peters's testimony and exhibits that the net income attributable to the store's operations increased after the loss of Coors. Peters also observed that sales increased each year from 1966 through 1970 and declined only in 1971, the last year Letcher operated the store.[10]

## II.

The parties dispute vigorously whether the evidence presented in the second trial proved that Letcher suffered injury in fact and damages as a result of Coors's antitrust violation. Coors argues that the district judge should have directed a verdict on the ground of insufficiency of the plaintiff's evidence. The plaintiff seeks a new trial on the issue of damages on the ground that the jury's award of $15,000 represents less than one-third of the damages proved. We must uphold the district court's judgment unless "there is a complete absence of substantial

| Time Period | Actual Percent of Markup | Losses Based on 25% Markup |
|---|---|---|
| January–August 1967 | 15% | $16,191.00 |
| September 1967–August 1968 | 15% | 26,727.00 |
| September 1968–August 1969 | 17% | 22,376.00 |
| September 1969–August 1970 | 20% | 11,613.00 |
| September 1970–July 17, 1971 | 18% | 12,689.00 |
| | | $89,697.00 |

8. According to Coors's expert, Wayne Peters, goodwill is the amount that a purchaser would be willing to pay for a business over and above the value of the business's tangible assets. Valuing a business's goodwill, of course, is a subjective determination that takes into consideration factors such as a business's age, profit history, customers, and potential for future earnings.

9. Relying on the assumption that the store reduced its markup from 25 percent to 15 percent in 1966, Green calculated the store's goodwill value by adding the lost gross profits for each year of the store's operation to the net profits

for the store as they appeared on the store's corporate income tax returns. The sum of lost gross profits and net profits for the four years, 1967 to 1971, was identified as adjusted net income. Adjusted net income, in the amount of $100,046, was divided by the number of years to obtain average net income. Mr. Green then subtracted from average net income the store's return on capital computed at 6 percent per year to derive average net income after return on investments. This figure, $21,980, was multiplied by five to arrive at a goodwill value of $109,899.

10. According to Peters, the net income generated by the store from 1966 to 1971 was as follows:

| YEAR | NET INCOME |
|---|---|
| 1966 | $17,042.00 |

| FISCAL YEAR | NET INCOME |
|---|---|
| September 1, 1967–August 31, 1968 | $26,810.00 |
| September 1, 1968–August 31, 1969 | 32,572.00 |
| September 1, 1969–August 31, 1970 | 31,582.00 |
| September 1, 1970–August 31, 1971 | 22,834.00 |

probative facts to support the jury's verdict". *Lavender v. Kurn*, 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, *quoted in Copper Liquor, Inc. v. Adolph Coors Co.*, 5 Cir. 1975, 506 F.2d 934, 953; *see Greene v. General Foods Corp.*, 5 Cir. 1975, 517 F.2d 635, 663, *cert. denied*, 1976, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348.

■ To recover treble damages under the antitrust laws a plaintiff, such as Letcher, who has proved a violation of the Sherman Act must also prove "as a matter of fact and with a fair degree of certainty" a causal link between the violation and the fact of injury to the plaintiff's business or property. *Response of Carolina, Inc. v. Leasco Response, Inc.*, 5 Cir. 1976, 537 F.2d 1307, 1321 (quoting *Terrell v. Household Goods Carriers' Bureau*, 5 Cir. 1974, 494 F.2d 16, 20, *cert. denied*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260); *see Ford Motor Co. v. Webster's Auto Sales, Inc.*, 1 Cir. 1966, 361 F.2d 874, 885; Comment, Monetary Recovery Under Federal Antitrust Statutes, 45 Tex.L.Rev. 856, 860–63 (1967). A plaintiff is held to a less rigid standard of proof with respect to the amount of damage caused by an antitrust violation, because economic harm is intangible and difficult to quantify. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 1931, 282 U.S. 555, 562–65, 51 S.Ct. 248, 250–251, 75 L.Ed. 544, 548–49; *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d at 953. But, a jury may not render a verdict on the basis of speculation or guesswork; there must be reasonable evidence from which a jury can rationally infer the amount of damages. *Bigelow v. RKO Radio Pictures, Inc.*, 1946, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652, 660; *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d at 885; *see Greene v. General Foods Corp.*, 517 F.2d at 662.

The evidence of lost profits presented by the plaintiff at the second trial was similar to the evidence introduced at the first trial. The plaintiff did not rely in the second trial on bank deposits during the summer months of 1966 as proof of lost sales, but presented testimony of Mrs. Williams that the store reduced its markup on all goods from 25 percent to 15 percent after losing Coors's beer. The plaintiff's expert witness, Kenneth Green, assumed that the price of goods was actually marked down 10 percent in computing the store's lost income for the years 1967 through 1971. In our earlier decision we said that this evidence, when considered in light of "*the fact that by his own admission Letcher sold all the Coors he ever purchased from the distributor at a loss*" (emphasis in original), 506 F.2d at 952, was not sufficient to prove injury.

In one critical respect, however, the evidence at the second trial differed from the evidence introduced at the earlier trial. In the first trial Letcher testified that he lost money overall on the sale of Coors. In the second trial Mrs. Williams testified that the store did not sell all Coors beer at a loss. She said Coors beer was advertised and sold at a discount on only three weekends between January 24, 1966 and June 3, 1966. During each of these weekends about 75 cases of Coors were sold. The rest of the 1,211 cases purchased from Coors were sold at a price of $1.00 a case above cost.

■ We conclude that the trial court did not err in refusing to direct a verdict for Coors. We hold also that the evidence, when considered in the light most favorable to the plaintiff, is sufficient to support the jury's findings of injury in fact and damages. *See Boeing Co. v. Shipman*, 5 Cir. en banc 1969, 411 F.2d 365, 374–75. Mrs. Williams testified that the store realized a profit of about $1,000 on its sale of Coors between January 1966 and June 1966.[11]

11. At the first trial, Letcher testified that the store may have sold some Coors at a profit. 509 F.2d at 759. We noted that this "impressionistic recollection" was not inconsistent with Coors's uncontradicted assertion that Letcher sold Coors at an overall loss. At the second trial, the plaintiff maintained that Coors was not sold at an overall loss. Mrs. Williams's testimony is consistent with this position. Moreover, she testified with reasonable specificity with respect to the volume and price of Coors sold at the store. Her credibility was a question for the jury. *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 5 Cir. 1973, 471 F.2d

The jury could conclude with reasonable certainty on the basis of this testimony, that the termination of Coors beer deliveries directly resulted in the loss of future profits. *See Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d at 1321. The jury's finding of injury in fact, therefore, rests on substantial probative facts and should not be disturbed by this Court. *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d at 953. The jury could properly rely on the store's sales volume and profit margin on Coors from January 1966 to June 1966 to compute the plaintiff's damages that resulted from Coors's antitrust violation. *Lehrman v. Gulf Oil Corp.*, 5 Cir. 1974, 500 F.2d 659, 668, *cert. denied*, 1975, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400. That the plaintiff did not show the exact volume of Coors's beer that would have been sold from June 1966 until July 1971 or the precise amount of damages does not absolve Coors of liability. *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 5 Cir. 1973, 471 F.2d 894, 902, *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150; *A. C. Becken Co. v. Gemex Corp.*, 7 Cir. 1959, 272 F.2d 1, 5, *cert. denied*, 1960, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 876. To hold otherwise "would enable [Coors] to profit by [its] wrongdoing at the expense of [its] victim". *Bigelow v. RKO Radio Pictures*, 327 U.S. at 264, 66 S.Ct. at 580, 90 L.Ed. at 660.[12] We affirm the district court's damage award.[13]

### III.

The plaintiff, having recovered treble damages for Coors's antitrust violation, was entitled to reasonable attorneys' fees under section 4 of the Clayton Act, 15 U.S.C. § 15. On appeal, the plaintiff contends that the district court's $45,000 attorneys' fee award was inadequate; that a reasonable fee in this case would be no less than $250,000. We are limited to consider-

ing whether the district court abused its discretion in awarding attorneys' fees. *Johnson v. Georgia Highway Express, Inc.*, 5 Cir. 1974, 488 F.2d 714, 717.

In awarding statutorily authorized attorneys' fees in this circuit, district courts must follow the guidelines set forth by this Court in *Johnson v. Georgia Highway Express, Inc.*, 5 Cir. 1974, 488 F.2d 714. *Fain v. Caddo Parish Police Jury*, 5 Cir. 1977, 564 F.2d 707, 710; *Matter of First Colonial Corp. of America*, 5 Cir. 1977, 544 F.2d 1291, 1299, *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388. *Johnson* listed the following 12 factors as bearing on the question of reasonable attorneys' fees:

(1) The time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

488 F.2d at 717–19. In computing reasonable attorneys' fees, the district judge must "explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in *Johnson* affected his decision". *Matter of First Colonial Corp. of America*, 544 F.2d at 1300. "What we require is not a meaningless exercise in parroting and answering of *Johnson's* twelve criteria, but some assurance that the court has arrived at a just compensation based on appropriate standards." *Davis v. Fletcher*, 5 Cir. 1979, 598 F.2d 469, 470–71; *see Fain v. Caddo Parish Police Jury*, 564 F.2d at 709.

894, 903, *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150.

**12.** We have considered and found meritless arguments of the defendant-appellant not discussed in this opinion.

**13.** The plaintiff argues that the damage award was too low because it does not compensate for lost future profits that resulted from the reduction in markup. The plaintiff's evidence of a reduction in markup is insufficient, however, to compel a reversal of the jury's damage award.

The district court, in its "Order On Plaintiffs' Application For Attorneys' Fees", made the following findings of fact with respect to the *Johnson* criteria:

(1) This has been a protracted case dating back to 1966. Lead counsel for the Plaintiffs . . . has spent . . . 2,000 hours working on it and itemizes no less than 975. Associate counsel . . has spent . . . 1200 hours working on the case and itemizes no less than 825. Local counsel . . . have spent . . 150 hours working on the case—almost all of which have been spent on days when there were actual hearings in court. There has been little unnecessary duplication of effort among the Plaintiffs' counsel. Actual expenses incurred by the Plaintiffs approach $25,000, and no less than $16,000 are itemized.

(2) This case has involved complex issues of price-fixing and territorial restraints. The appellate decision rendered after the first trial was somewhat of a landmark decision in this Circuit.

(3) This case has called for the services of counsel with considerable experience in handling antitrust matters. The Plaintiffs' lead counsel . . . possesses such experience.

(4) There has been no preclusion of other employment by virtue of the Plaintiffs' attorneys accepting employment in this case.

(5) The customary fee for handling an antitrust case in federal court under prevailing rates is no less that $100 per hour for lead counsel and $75 per hour for assistant counsel.

(6) The fee arrangement in this case is best described as "contingent fee/fee awarded" contract. In the event the attorneys' fees awarded by the court are less than the amount of trebled damages, counsel are to receive an amount equal to 50% of the combined total of treble damages and attorneys' fees. In the event the attorneys' fees exceed the amount of trebled damages, counsel are to receive an amount equal to the attorneys' fees awarded by the court.

(7) Due to the drawn-out nature of this case, it has not involved priority work that delayed other legal employment.

(8) In the first trial of this case, the jury returned a damage award of $101,011, which was trebled to $303,033. The attorneys' fees in the amount of $75,000 were also awarded. The Defendant appealed, and the Fifth Circuit affirmed as to liability but vacated the awards of damages and attorneys' fees, remanding the case for further proceedings on causation, damages, and—if damages were awarded—attorneys' fees. . . . At the second trial the jury found causation and awarded damages in the amount of $15,000, which will be trebled to $45,000. Besides producing a landmark decision in the Fifth Circuit, this litigation has helped put an end to the Defendant's practices of price-fixing in territorial restraints.

(9) . . . lead counsel for the Plaintiffs, is quite experienced in the practice of antitrust law. Other counsel are also competent, though not specialists in antitrust law.

(10) This case has had no undesirable aspects as far as generating ill feelings that would have had adverse economic impact on counsels' legal practice.

(11) None of the Plaintiffs' counsel represented the Plaintiffs prior to this lawsuit, nor have they represented the Plaintiffs in regard to any other matter. Nor is there any expectation that counsel will be employed by any other Plaintiffs in the future.

(12) The court has reviewed the awards of attorneys' fees in the following cases . . . . .

(13) Taking into consideration all of the above factors, the court finds that reasonable attorneys' fees amount to $45,000.

■ The district court's findings of fact are well developed; the order, however, does not articulate the reasons for awarding attorneys' fees of $45,000. The court adverted to each of the *Johnson* factors but the only one that seems related to the actu-

al award is criterion 6. The district court apparently concluded that an award equal to treble damages was adequate because the fee contract between the plaintiffs and their counsel provided that no adjustment would be made in the district court's fee award if the award was equal to or greater than treble damages.[14] There is no hint in the district court's order as to how the other *Johnson* factors, which also must be considered, affected the attorneys' fee award. *Piambino v. Bailey*, 5 Cir. 1980, 610 F.2d 1306, 1328.

We have encouraged district courts to apply the *Johnson* test flexibly in computing attorneys' fees. But unless a district court explicates the bases of its decision, this Court is unable to review properly the propriety of a fee award. *Fain v. Caddo Parish Police Jury*, 5 Cir. 1977, 564 F.2d 707, 709. Although all of the *Johnson* factors must be considered, recent decisions of this Court suggest that district courts, in computing attorneys' fees, should pay special heed to *Johnson* criteria numbers (1) the time and labor involved, (5) the customary fee, (8) the amount involved and the results obtained, and (9) the experience, reputation, and ability of counsel. *Mitchell v. Scheepvaart Maatschappij Trans-Ocean*, 5 Cir. 1978, 579 F.2d 1274, 1281 n.10; *see Rainey v. Jackson State College*, 5 Cir. 1977, 551 F.2d

672, 677. In *Matter of First Colonial Corp. of America*, 5 Cir. 1977, 544 F.2d 1291, for example, the Court stated that in computing attorneys' fees, a district court "must ascertain the nature and extent of the services supplied by the attorney". *Id.* at 1299. Next, the court should value the services according to the customary fee and quality of the legal work. *Id.* at 1300. Finally, the court should adjust the compensation on the basis of other *Johnson* factors that may be of significance because of the particular case.[15] *See generally* Johnson & Blackburn, First Colonial: *The Fifth Circuit Makes a Definitive Statement on the Award of Attorneys' Fees in Bankruptcy Cases*, 24 Loy. L.Rev. 189 (1978).

Applying the *First Colonial* approach to the district court's findings of fact, we conclude that the attorneys' fee award was so low in this case as to constitute an abuse of discretion. The district court found that the plaintiff's lead counsel had worked about 2,000 hours on this case and had itemized at least 975 hours. Associate counsel spent 1,200 hours preparing the case of which at least 825 hours were itemized. Lead counsel was assisted by local counsel who itemized 150 hours of legal services. Significantly, the court found "little unnecessary duplication of effort among Plain-

---

14. A district court is not bound by, and may not merely ratify, the agreement of the parties as to the amount of attorneys' fees. *Piambino v. Bailey*, 5 Cir. 1980, 610 F.2d 1306, 1328.

15. The *Johnson* test, as interpreted in *First Colonial*, is similar to the Third Circuit's "lodestar" method of computing attorneys' fees. *See Lindy Bros. Bldrs., Inc. v. American Radiator & Standard Sanitary Corp.*, 3 Cir. 1976, 540 F.2d 102, 112–18; *Lindy Bros. Bldrs., Inc. v. American Radiator & Standard Sanitary Corp.*, 3 Cir. 1974, 487 F.2d 161, 167–69; *accord, City of Detroit v. Grinnell Corp.*, 2 Cir. 1977, 560 F.2d 1093, 1098–1103; *City of Detroit v. Grinnell Corp.*, 2 Cir. 1974, 495 F.2d 448, 469–74; *Grunin v. International House of Pancakes*, 8 Cir., 513 F.2d 114, 128–29, *cert. denied*, 1975, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93; *Knutson v. Daily Review, Inc.*, N.D.Cal.1979, 479 F.Supp. 1263, 1268–72. Under the "lodestar" analysis, the district court must find determine the number of hours reasonably spent by the plaintiff's attorney on matters upon which the plaintiff was successful. Next, the

court must ascertain the value of the attorney's time based on his or her normal billing rate. If a number of attorneys are involved, the court may use different rates to reflect the different amounts of skill, expertise, and experience possessed by the different attorneys. The court then must determine the "lodestar" amount by multiplying the hours spent by each attorney on the case by his or her respective hourly rate. Before arriving at a final award, at least two other subjective factors must be considered. The first is the contingent nature of success. The second factor is the extent to which any exceptionally positive or negative quality of an attorney's work mandates increasing or decreasing the lodestar. A fact to be considered in making this adjustment is the amount recovered in damages as compared to the defendant's potential liability. *See Knutson v. Daily Review, Inc.*, 479 F.Supp. at 1269–70. *See generally* Comment, Attorneys' Fees in Individual and Class Action Antitrust Litigation, 60 Cal.L. Rev. 1656 (1972).

tiffs' counsel". The district court stated that the customary fee for these services was $100 for lead counsel and $75 for assistant counsel and that the plaintiff's lead counsel had considerable experience with antitrust cases. The plaintiff's actual expenses, between $16,000 and $25,000, were included in the award of $45,000.

Other *Johnson* factors, however, also merit consideration in this case. The plaintiff's recovery was not large; treble damages were only $45,000. This should not be ignored, but a modest damage award should not control an attorneys' fee award.[16] *Rheuark v. Shaw*, N.D.Tex.1979, 477 F.Supp. 897, 930. This is particularly true here because the district court also found that the case "has involved complex issues of price-fixing and territorial restraints. . . . Besides producing a landmark decision in the Fifth Circuit, this litigation has helped put an end to the Defendant's price-fixing and territorial restraints". This case is evidence that "[t]he violation of an important public policy may involve little by way of actual damages, so far as a single individual is concerned . . . . If a defendant may feel that the cost of litigation, and, particularly, that the financial circumstances of an injured party may mean that the chances of suit being brought, or continued in the face of opposition, will be small, there will be little brake upon deliberate wrongdoing. In such instances public policy may suggest an award [of legal fees] that will remove the burden from the shoulders of the plaintiff seeking to vindicate the public right." *Knight v. Auciello*, 1 Cir. 1972, 453 F.2d 852, 853.

The district court's findings reveal that the remaining *Johnson* factors such as preclusion of other employment, time limitations imposed by the client, and the nature and length of the professional relationship with the client, are not of great significance. Nevertheless, the district court

should have expressly stated this in his conclusions of law.

On the first trial, the plaintiff received a damage award of $101,011 and attorneys' fees in the amount of $75,000. It is true that on the second trial the damages were reduced, but it is difficult to imagine why the additional legal work required on the retrial was not taken into consideration. Instead, the fees were reduced. If the district judge assumed that he should deny attorneys' fees in excess of the award of damages, he acted on an improper assumption.

█ The use of what might be termed a "laundry list" as criteria in determining attorneys' fees unfortunately lends itself to the approach the district court employed in this case. But it must be admitted that each item on the list is relevant, to a degree dependent on the facts of the particular case. The existence of twelve items, varying in relevance and weight, some at odds with others, imposes on a district judge the burden of clear articulation of the basis for his award of fees. We are sympathetic with the district judge. He is closer to the case than we. And we should go slow in finding that he abused his discretion. Nevertheless, in the circumstances this case presents we feel compelled to conclude that the district court abused its discretion by failing to attach appropriate significance to the *Johnson* criteria most pertinent to reasonable attorneys' fees and by neglecting to develop fully the reasons for his award.

We reverse the district court's attorneys' fee award and remand the case for reconsideration in light of this opinion. In computing reasonable attorneys' fees, the district court should compensate the plaintiff's counsel for the value of their services rendered in connection with this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

16. The district court, in awarding $45,000 attorneys' fees, seems to have placed great weight on the amount of treble damages. We have recognized that a substantial damage award may justify an enhancement of an attorneys' fee award over and above the amount regularly received for such services. *Wolf v. Frank*, 5 Cir. 1977, 555 F.2d 1213, 1218. The converse may be true in this case. Nevertheless, the size of a damage award should not be the exclusive determinate of an attorneys' fee award.