Lawrence M. ABRAMS, M.D.,
Plaintiff-Appellee,
Cross-Appellant,

v.

BAYLOR COLLEGE OF MEDICINE,
Defendant-Appellant, Cross-Appellee.

Stuart A. LINDE, M.D.,
Plaintiff-Appellee,
Cross-Appellant,

v.

BAYLOR COLLEGE OF MEDICINE,
Defendant-Appellant, Cross-Appellee.

No. 84–2475.

United States Court of Appeals,
Fifth Circuit.

Dec. 8, 1986.

See also, D.C., 581 F.Supp. 1570.

Nancy Morrison O'Connor, Fulbright & Jaworski, William R. Pakalka, Houston, Tex., for defendant-appellant, cross-appellee.

Stuart M. Nelkin, Nelkin & Nelkin, Houston, Tex., for Abrams & Linde.

Stanley G. Schneider, Houston, Tex., Ellen S. Weisburd, Anti-Defamation League of B'Nai B'rith, Justin J. Finger, Jeffrey P. Sinensky, Jill L. Kahn, New York City, for amicus.

Before BROWN, JOHNSON, and JOLLY, Circuit Judges

JOHN R. BROWN, Circuit Judge:

In 1977, Baylor College of Medicine (Baylor or the college) agreed to provide special cardiovascular services to the King Faisal Hospital in Riyadh, Saudi Arabia. These services were to be provided by a team of surgeons, anesthesiologists, and other support personnel who were sent to Saudi Arabia for three month "rotation" periods. Since the first team departed for Riyadh in 1978, Baylor has not selected a single Jew to participate in the Faisal Hospital rotation program. In 1982, two anesthesiologists filed suit against Baylor claiming that they had unlawfully been denied the opportunity to participate in the program because they were Jews.

In this appeal, we review the District Court's judgment based on its findings that their claims were timely filed, and that the actions of the college constituted intentional discrimination, on the basis of religion, in violation of Title VII. On reviewing the record and concluding that the Court's findings are legally acceptable in light of the record viewed in its entirety, we affirm that judgment based on Title VII.

Baylor also appeals the very substantial attorney's fees the District Court awarded to the plaintiffs. Because we can discern no reasonable basis for a significant portion of the fees awarded, we vacate the fee award and remand for reconsideration and reallocation of attorney's fees.

### International Medicine—Across National, Political and Religious Lines

The King Faisal Hospital (Faisal Hospital) is a large medical complex owned by the Kingdom of Saudi Arabia. Its facilities are devoted primarily to the care and treatment of members of the Saudi royal family, but are also made available to those members of the Saudi populace who are afflicted with particularly difficult illnesses. As a result of its unique situation in Saudi Arabia, Faisal Hospital offers fertile ground for the training of American physi-

cians. Saudi Arabia has a high incidence of rheumatic fever, so the incidence of pediatric patients afflicted with congenital or heart-valve defects is markedly higher in that country than in the United States. That, in turn, presents physicians with a greater opportunity for clinical experience in the treatment of childhood heart disease than is generally available in America.

The stature of Faisal Hospital, the training opportunities it presented, and certain eleemosynary considerations, led Baylor to agree to provide cardiovascular surgical services to the Saudi hospital in 1977. The agreement, which continues in effect, provided that Baylor would send surgeons, anesthesiologists, and other operating room personnel to Riyadh for three month rotations. Baylor is reimbursed by the Saudis for the lion's share of the cost associated with the program, including the cost of providing salary, travel, and fringe benefits to the physicians and nurses participating in the rotations.

In order to ensure that the rotations are adequately staffed, the salaries for program participants are set at a very attractive level. Indeed, while stationed at the Faisal Hospital, Baylor physicians receive a salary almost twice that paid to their colleagues who remain behind to care for patients in Houston. The combination of clinical experience and an attractive salary has engendered substantial interest in the rotations among the Baylor faculty. Many Baylor physicians have taken several rotations in Riyadh.

Most of the participants in the Saudi rotations are drawn from Baylor's prestigious Fondren-Brown cardiovascular unit at the Methodist Hospital. The physicians at Fondren-Brown all have excellent professional and academic credentials, but the only criteria for participation in the program are membership on the Baylor faculty and certification—for the anesthesiologists—by the American Board of Anesthesiology or its foreign equivalent.[1]

---

1. At oral argument before this Court, counsel for Baylor asserted that there were as many as six objective qualifications required of those who desired to participate in a Saudi rotation.

Physicians who possess these qualifications are not required formally to apply for a Saudi rotation. Instead, those who desire to participate merely communicate their interest by word of mouth to the Baylor administrators in charge of the program. Shortly thereafter, the interested physician is placed on a constantly changing scheduling sheet. At the time the physician is placed on the schedule, his name is also submitted for inclusion in the block entry visa issued by the Saudi government for the benefit of the Faisal Hospital rotation program.

The plaintiffs in this litigation are each cardiovascular anesthesiologists who met the objective criteria for participation in a Saudi rotation. Dr. Lawrence Abrams is a Board certified anesthesiologist who became a member of the Baylor faculty in July of 1978. Dr. Stewart Linde, a South African citizen, holds the equivalent of Board certification in anesthesiology and was employed as a Baylor faculty member in September of 1979.[2]

### Race/Religion Raises its Head

Early in their employment, each of the plaintiffs indicated an interest in participating in a rotation, but each was informed that he could not participate because—as a Jew—he would be unable to secure an entry visa which would permit him to enter Saudi Arabia.[3] There is no evidence in the record that that statement represented the actual position of the Saudi government with regard to the participation of Jews in the program. In addition, there is no evi-

dence that Baylor even attempted to ascertain the official position of the Saudi government on this issue. Despite this "visa problem," Abrams and Linde persisted in their desire to undertake a Saudi rotation. Nevertheless, each time a team departed for Riyadh, Jewish personnel were excluded from participation.

Dr. Abrams became a vocal critic of this practice. His chief complaint concerned the marked inequity in compensation and workload between the physicians who participated in the program and those who were excluded, because of their inability to take rotations. Dr. Abrams was eventually transferred by Baylor, over his objections, from Fondren-Brown to the Ben Taub Hospital. While Dr. Linde did not undertake vocal opposition to the policy, he was likewise excluded from participating in the Saudi rotations.

Dr. Abrams and Dr. Linde eventually filed charges of discrimination with the EEOC. Abrams filed his charge on November 7, 1982; Linde filed his on February 18, 1982. Both of these filings occurred substantially more than 180 days after the plaintiffs first became aware of their "visa problems." Baylor had, however, sent teams to Riyadh within 180 days preceding the filing of the plaintiffs' charges. When the timeliness of the claims was asserted by Baylor as a defense at trial, the District Court concluded that Baylor's policy of excluding Jews from the rotations constituted a continuing violation

Before this lawsuit was instituted, however, the plaintiffs Abrams and Linde filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC). In response to an inquiry from the EEOC, Baylor stated that the only qualifications for participation in the program were membership on the Baylor faculty and Board certification. The District Court discredited Baylor's assertion at trial that additional qualifications existed. That finding is fully supported by the record and is not clearly erroneous.

2. Dr. Abrams resigned his employment with Baylor in October of 1980; Dr. Linde is still employed by Baylor as an anesthesiologist.

3. Dr. Abrams was informed of the Faisal Hospital rotation program by the Chairman of Baylor's anesthesiology department, Dr. Dean Morrow, a few days before he commenced his employment with Baylor in 1978. At that time, he was told that he was ineligible to participate because there was a problem securing visas for Jews. Dr. Linde first learned of the program, and of the visa problem, from Dr. Abrams in 1980. Dr. Linde then discussed the problem with Dr. Morrow and with Dr. Sharon Storey, who was responsible for designating rotation participants. Dr. Linde was informed by each that Jews were not eligible to participate in the rotations.

of Title VII. It therefore held that the claims had been timely filed.

The case proceeded to trial on the merits, and the District Court found that Baylor had intentionally discriminated against Abrams and Linde on the basis of their Jewish religion.[4] It therefore awarded them backpay relief based upon the number of rotations in which each could have participated during his tenure at Baylor. In addition, the Court awarded Abrams and Linde attorneys' fees in excess of $280,000. Baylor has appealed, contesting the findings of timeliness and intentional discrimination, and the award of attorneys' fees. The plaintiffs have undertaken a cross-appeal that is largely precautionary.

### The Title VII Claims

■ A district court's finding of intentional discrimination under Title VII is to be reviewed under the clearly erroneous standard. *Anderson v. City of Bessemer City,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). Indeed, the Supreme Court has stated

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

470 U.S. at 574, 105 S.Ct. at 1512, 84 L.Ed.2d at 528. In this Circuit, the clearly erroneous standard also governs review of a district court's finding of a continuing violation when relevant to the issue of the timeliness of a claim filed under Title VII.

*Glass v. Petro-Tex Chem. Corp.,* 757 F.2d 1554, 1560 (5th Cir.1985). With those standards of review in mind, we now examine Baylor's contentions that the District Court erred in its findings on the issues of timeliness and intentional discrimination.

### Federal Complaint—In Time?

■ Title VII of the Civil Rights Act of 1964 prohibits employment discrimination against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Title VII affords a private right of action to individuals aggrieved by unlawful discrimination but, in order to preserve their statutory rights, employees must file their charges of discrimination "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e). Timely filing is a prerequisite to the maintenance of a Title VII action[5] and the failure to file within the statutory period will ordinarily operate as a bar to suit.[6]

■ In the Fifth Circuit, however, we have recognized that "equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated." *Glass,* 757 F.2d at 1560; *Dumas v. Town of Mount Vernon,* 612 F.2d 974, 978 (5th Cir.1980). One such equitable consideration arises in the context of a continuing violation of Title VII. Where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts, the violation may be found to be a continuing one that "relieves a plaintiff

---

4. The plaintiffs also asserted an implied cause of action against Baylor under the terms of the Export Administration Act of 1979 (EAA), 50 U.S.C. App. § 2401 *et seq.* The District Court found Baylor liable on this claim as well, a decision that Baylor has appealed. The plaintiffs concede, however, that they have been afforded complete relief under the Title VII holding of the District Court. Because we affirm the Title VII judgment, we therefore do not reach the remaining questions regarding the existence of a private right of action under the terms of

the EAA, or the liability *vel non* of Baylor for violations of that statute.

5. *Alexander v. Gardner-Denver Co.,* 415 S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147, 157 (1974).

6. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 1887 n. 4, 52 L.Ed.2d 571, 576 n. 4 (1977).

who makes such a claim from the burden of proving that the entire violation occurred within the actionable period." *Berry v. Board of Supervisors*, 715 F.2d 971, 979 (5th Cir.1983).

### A Theoryless Theory

One of the chief difficulties in this case is that Baylor simply never arrived at a theory of its case. There was at least a theoretical possibility that Baylor could assert that "non-Jewishness" was a bona fide occupational qualification (BFOQ) for the Faisal Hospital rotation program, notwithstanding the fact that the exclusion of Jews as Jews would normally be prohibited from discrimination under Title VII. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (gender is BFOQ for employment as a state prison guard). Baylor just danced all around this; it never zeroed in on this as a BFOQ. In order to substantiate that defense though, Baylor would have to prove that the official position of the Saudi government forbad or discouraged the participation of Jews in the program. That would have meant that Baylor would have to obtain formally an authoritative statement of the position of the Saudis. Yet Dr. DeBakey testified that it was not until 1983, more than a year after suit was instituted, that Baylor attempted to obtain such a statement. While the failure to seek or obtain such a critical determination is puzzling—and goes a long way toward knocking the props from under the BFOQ defense—a good explanation may well be the District Court's finding that Baylor's inaction was motivated, in part, by its desire not to "rock the boat" of its lucrative Saudi contributors.[7]

Worse than that, Baylor's own witnesses went a long way toward destroying the BFOQ defense. Both Dr. Abrams and Dr. Linde were informed, by various Baylor officials, that there were problems securing visas for Jews. Yet, Baylor never attempted to substantiate that "problem," and the

veracity of those assertions is called seriously into question by the following testimony of Dr. DeBakey:

> May I indicate to you that one of the reasons that I had not asked for a policy before was because *we never had a problem*. It has never come up before, and I have on occasions had Jewish physicians go [to Saudi Arabia] to see special patients I wanted them to see. *And we had no difficulty getting visas for them.*

(Emphasis added).

This brings us back to the continuing violation. We have no difficulty in upholding a finding of continuing violation when, as here, the employer's ambiguous acts serve to obscure the existence of an unlawful policy and fail to alert "the average lay person to act to protect his rights." *Glass*, 757 F.2d at 1561; *Dumas*, 612 F.2d at 978.

This theory of continuing violation has to be guardedly employed because within it are the seeds of the destruction of statutes of limitation in Title VII cases. As we pointed out in *Berry*,

> courts have differed over whether the existence of the policy itself constitutes a continuing violation, making a suit timely if the policy remains in effect during the actionable period, or whether there must be some actual application of it to the plaintiff within the period.

715 F.2d at 979. If the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely. Such a result would render § 2000e–5(e) a nullity, and we decline to adopt it.

■ We hold, instead, that to establish a continuing violation, a plaintiff must show some application of the illegal policy to him (or to his class) within the 180 days preceding the filing of his complaint. *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir.1980). Just as there can

---

**7.** Another reason that Baylor may have not ardently proposed a "non-Jewishness" BFOQ defense is that such a defense at least arguably

could collide with the anti-boycott provisions of the Export Administration Act. *See* 50 U.S.C. App. § 2407.

be no negligence in the air,[8] so the existence of a quiescent discriminatory policy is simply insufficient to toll the statute of limitations. To hold to the contrary would expose employers to a virtually open-ended period of liability and would, as we said, read the statute of limitations right out of existence. Thus, we now review the District Court's finding that Baylor engaged in a continuing violation by virtue of its exclusionary policy.

█ We must bear in mind that a reasonably prudent employee will not necessarily conclude that his employer is an illegal discriminator on the basis of one conversation and one at least arguably nondiscriminatory act. *Glass,* 757 F.2d at 1562. In this case, both Abrams and Linde were informed that their ineligibility for rotations arose from their visa problems although all now recognize that this came about from their Jewish religion. There was testimony at trial that various mechanisms were available by which Baylor could have attempted to resolve the visa difficulties, so Abrams and Linde had a reasonable basis for assuming that the decision to exclude them was not a final one. In short, at the time that Baylor asserts that Abrams and Linde should have filed their claim, the doctors did not yet have enough information by which a "reasonably prudent person similarly situated" could have realized that he was the victim of illegal discrimination. *See Glass,* 757 F.2d at 1560.

The trial court could conclude that the continuing nature of Baylor's violation is evident from the fact that the college persisted in its exclusionary practices without any attempt to ascertain an official position from the Saudis. In the case of Dr. Abrams, the college persisted in its refusal to designate him for the Faisal Hospital rotation program until the date on which he resigned his position as a member of the faculty. Dr. Linde, in turn, was not offered a rotation until after he had already filed suit against the college.

Finally, we have no difficulty in upholding the District Court's finding that the unlawful policy was applied to Abrams and Linde within the 180 days preceding the filing of their complaints. The District Court found that the departures of the teams for Riyadh were the relevant employment decisions for purposes of the filing requirement.[9] Baylor's own witnesses, among them Drs. Beall and Storey, testified that the list of those scheduled to go to Riyadh changed almost constantly to account for cancellations and rescheduling of personnel. Given that the list was not final until the moment the team actually departed, the District Court's finding that the departure of a team was the relevant decision, for purposes of the time bar, is plausible in light of the record viewed as a whole. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512, 84 L.Ed.2d at 528. We hold, therefore, that the plaintiffs' claims were timely filed.

### Religious Discrimination

█ A finding of intentional—non-accidental, non-inadvertent—discrimination under Title VII is a finding of fact. *Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982). We have been reminded by the Supreme Court that in reviewing findings of fact, we must be aware that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). We have fully reviewed the record of the proceedings below and conclude that there is ample support for the District Court's view that Baylor engaged in intentional discrimination against Jews in its administration of the Faisal Hospital rotation pro-

---

**8.** *Cf. Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E.2d 99 (1928).

**9.** We recognize that an argument can be made that the relevant decision was the confection of the list of personnel scheduled for the rotation, but we find such an argument unpersuasive in light of the evidence at trial.

gram. In its findings of fact, the District Court stated that:

> Baylor has not established any bona fide justification for excluding Jews from the [Faisal Hospital] program. These exclusionary practices were undertaken unilaterally by Baylor administrative officials. There is no evidence to show that Baylor officials took any appropriate steps to determine the actual policy of the Kingdom of Saudi Arabia toward Jews participating in the program. Moreover, Baylor took no steps to alleviate or rectify the effects of any perceived discriminatory practices and policies on the part of the Saudis.

In light of the record, and the District Court's findings, we must conclude that the college intentionally excluded Jews from its beneficial and educational rotation program at Faisal Hospital. The District Court's finding of intentional discrimination is not clearly erroneous and we uphold it.

### Attorneys' Fees

▇ Both Baylor and the plaintiffs take issue with the award of attorneys' fees. The plaintiffs complain of the District Court's failure to award them reimbursement of paralegal expenses, while Baylor takes issue with both the methodology and the magnitude of the award entered. At the threshold, we dismiss the plaintiffs' claims as without merit. An award of attorney's fees rests within the sound discretion of the trial court. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974). It was entirely reasonable for the court below to conclude that the cost of the services of support personnel—such as paralegals—was encompassed within the relatively high hourly billing rate awarded for the time of the plaintiffs' attorneys. We review a fee award solely for abuse of discretion and, therefore, we conclude that the District Court could properly refuse to award paralegal expenses.

Baylor's contentions, however, are of substantially greater weight. They raise three issues with regard to the fee award. First, Baylor argues that the "lodestar" calculation undertaken by the District Court was an abuse of discretion because it awarded fees for time not reasonably expended, for claims not heard in the lawsuit, and for duplicative effort on the part of the plaintiffs' attorneys. Second, Baylor contends that the award improperly used a uniform hourly rate per attorney without regard for the type of work actually performed. Finally, the college vigorously contests the 25% "upward adjustment" of the fee fixed by the District Court on the basis of the novelty of the issues, the undesirability of the case, and the exceptional success the plaintiffs obtained in the litigation.

▇ In *Johnson,* we enumerated in great detail the factors to be considered by the district courts in arriving at an appropriate fee award. Among the most important of these factors is the lodestar figure; that is, the hours reasonably expended on a case multiplied by the prevailing hourly rate in the community for similar work. *Graves v. Barnes,* 700 F.2d 220, 222 (5th Cir.1983). The reasonableness of the time expended and its worth is governed by *Johnson* 's instruction that

> the trial judge should weigh the hours claimed against [the judge's] own knowledge, experience, and expertise of the time required to complete similar activities. If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do may be obviously discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such nonlegal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.

488 F.2d at 717. The court should also bear in mind that the fee applicant bears

the burden of documenting the appropriate hours expended and hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 434–35, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 50 (1983). Where the documentation is inadequate, the District Court has discretion to reduce the award accordingly. *Id.*

■ We have reviewed the findings in support of the fee award and agree with Baylor that the District Court's award was not based upon the careful weighing of evidence required by our precedents. *Johnson*, for example, specifically requires that the judge scrutinize the application for evidence of duplication of effort. In addition, the Court should consider whether the work performed was "legal work in the strict sense" or was merely clerical work that happened to be performed by a lawyer. 488 F.2d at 717. In this case, the judge appears to have done neither of those things. Instead, in computing the lodestar, he first multiplied the hours claimed by the billing rate and then turned to consider "the specific *Johnson* factors." This method simply will not do.

■ The time and hours spent on a case are a necessary ingredient in determining a fee award, but they should not be the sole basis for determining a fee. *Johnson*, 488 F.2d at 717. The *Johnson* factors govern the determination of reasonableness itself; they are not merely factors to be considered in adjusting the award once the lodestar is calculated. Having stated that, it is apparent that the award must be vacated and the case remanded for a reallocation of fees.

■ On remand, the District Court should expressly consider the content of the *Johnson* factors. It should be especially sensitive to the issue of duplication of effort and to the distinction between "legal work, in the strict sense," and clerical work "that a lawyer may do because he has no other help available." *Johnson*, 488 F.2d at 717. The language of *Johnson*, not merely the factors it established, provides the substantive criteria for determining an appropriate award. We emphasize that courts should award the amount necessary to insure that litigants will be able "to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical burden of Title VII litigation." *Id.* at 719.[10]

We now examine the 25% "upward adjustment" of the fee awarded by the District Court. We remind the District Court that the special skill of counsel is ordinarily reflected in hourly rates. An upward adjustment is justified

> only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

*Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891, 902 (1984). In addition, *Blum* explicitly stated that "neither complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee

---

**10.** One of the contentions raised by Baylor is that the fee award includes sums for hours expended on unsuccessful claims and on an unrelated anti-trust matter filed by the plaintiffs against the college. To be sure, hours expended on an unrelated lawsuit are not recoverable in this litigation. The fact that the plaintiff did not recover on all of the claims raised in *this* litigation, however, does not render the hours expended on unsuccessful contentions unrecoverable. As the Supreme Court stated in *Hensley,*

> Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.

461 U.S. at 440, 103 S.Ct. at 1943, 76 L.Ed.2d at 55.

The plaintiffs have substantially prevailed in this litigation and they are, therefore, entitled to all hours reasonably expended on the lawsuit—including those hours devoted to unsuccessful but related contentions. This does not mean that they may be compensated for unrelated claims pursued in this litigation. Thus, on remand, the District Court should carefully scrutinize counsel's time records to ensure that only those hours expended on this Title VII litigation are recovered.

award." *Id.*, at 898–99, 104 S.Ct. at 1549, 79 L.Ed.2d at 902. Finally, the results obtained by counsel "generally will be subsumed within other factors used to calculate a reasonable fee, [and] normally should not provide an independent basis for increasing the fee award." 465 U.S. at 900, 104 S.Ct. at 1549, 79 L.Ed.2d at 903.

▮ In light of *Blum,* we conclude that the upward adjustment awarded by the District Court was an abuse of discretion. We have read the record and we simply cannot agree that the issues involved in this case were that novel. Even had they been, novelty of issues simply does not demand an upward adjustment after *Blum.* In addition, while Baylor must acknowledge that counsel for the plaintiffs performed admirably and well, the quality of representation "generally is reflected in the reasonable hourly rate," and does not warrant an upward adjustment in this case. *Id.*

The District Courts must be mindful of the fact that counsel will normally be fully compensated by an award of the established hourly billing rate for all hours reasonably expended on the successful litigation. An upward adjustment is to be reserved for the rare case in which counsel obtains truly exceptional results. It should not be awarded as a matter of course. On this record, we cannot conclude that an upward adjustment was warranted. Therefore, that portion of the award is reversed.

### Conclusion

The plaintiffs' claims were timely filed and the District Court's findings of intentional discrimination are adequately supported by the record. The judgment against Baylor under Title VII is, therefore, affirmed. The award of attorneys' fees, however, fails to pass muster under the abuse of discretion standard and is, therefore, vacated and remanded for redetermination not inconsistent with this opin-

ion. All other contentions of the parties being without merit are rejected.[11]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

JOHNSON, Circuit Judge, concurring in part and dissenting in part.

I differ only with the majority's resolution of the issue of attorneys' fees. As I read its opinion, the majority has three chief complaints about how the district court treated the application for attorneys' fees.

First, it complains that the district court appears not to have scrutinized the application for evidence of duplication of effort and for work, not legal in nature, but rather clerical. These are considerations noted under the first of the factors or guidelines set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974) (emphasis in original): *"The time and labor required."* It is true that our cases direct that, "[i]n computing reasonable attorneys' fees, the district judge must 'explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in *Johnson* affected his decision.'" *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 581 (5th Cir.1980) (quoting *In re First Colonial Corp. of America,* 544 F.2d 1291, 1300 (5th Cir.), *cert. denied,* 431 U.S. 904 (1977)). Further, we have said that a district judge, having decided that some *Johnson* factors were "not of great significance," *"should* have expressly stated this in his conclusions of law." *Id.* at 584 (emphasis supplied). The *Copper Liquor* opinion's advisory language notwithstanding, other cases show that if there is "some assurance that the court has arrived at a just compensation based upon appropriate standards ..., it will not always be necessary for a district court to address each of the twelve [*Johnson*] factors in explaining the considerations affecting its decision." *Davis v. Fletcher,* 598 F.2d 469, 471 (5th

11. We express no view on the matters discussed in notes 4 and 7 *supra* which are not within our

Article III obligation and need not be reached.

Cir.1979). The district court here in fact invoked and applied the first, as well as a good many other, of the *Johnson* factors. Under these circumstances, there is "assurance" that the district court applied "appropriate standards" despite its failure to mention expressly two of the subsidiary considerations under *Johnson*'s first factor.[1]

Second, the majority faults the district court for multiplying the hours claimed by the billing rate and then turning to the *Johnson* factors. The majority insists that the district court must apply the *Johnson* factors to determine reasonableness before multiplying. Yet, it seems clear that the district court did in fact proceed as the majority bids. Before multiplying, the district court stated that it would use "the number of hours reasonably expended." The court also said that evidence concerning "the customary fees and current billing rates" had been "taken into account in determining the lodestar amount." Elsewhere, when considering an upward adjustment, the court expressly disclaimed any reliance upon *Johnson* factors, or certain of them, saying it had already "taken them into account in setting the lodestar amount." The majority seems most distressed by what it perceives as the district court's consideration of the reasonableness of the number of hours after it had performed multiplication. Yet, even after multiplication, once it had "turn[ed] to the specific *Johnson* factors," the district court declined to reduce the number of hours, explaining that it had already "determined a reasonable number of hours."

Even if the district court's mode of proceeding must be understood as the majority asserts, and assuming the sequence of calculations and considerations demanded by the majority is generally a good idea, reversal is not required in the instant case. The district court has made it clear that it determined what number of hours was reasonable. This finding remains unimpaired even if made after undertaking the purely mechanical multiplication calculation.

Finally, the majority concludes that the district court's twenty-five percent upward adjustment was an abuse of discretion. The district judge's opinion shows that he was keenly aware of the Supreme Court's decision in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). He nevertheless held that an upward adjustment was mandated. I would not upset this determination.

---

1. There is, moreover, some indication that the district court applied one of those considerations, indeed possibly too strictly, for it denied any recovery for the work performed by paralegals. *See Jones v. Armstrong Cork Co.,* 630 F.2d 324, 325 n. 1 (5th Cir.1980) ("Had Ms. Smith been a paralegal, then to the extent that she performed work that has traditionally been done by an attorney, Ms. Turner would have been entitled to have compensation for that work separately assessed and included in her award."); *see also Richardson v. Byrd,* 709 F.2d 1016, 1023 (5th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).