Celia **SANDOVAL**, Sofia D. Gonzales, Sara Alvarez, and Rosemary N. Madrid, on Behalf of Themselves and Others Similarly Situated, Plaintiffs,

v.

**SATICOY LEMON ASSOCIATION** and Seaboard Lemon Association, Defendants.

No. 88–2257 JGD.

United States District Court, C.D. California.

Aug. 31, 1990.

Paul Strauss, Charles Barnhill, Jr., Sarah Siskind, Davis, Miner, Barnhill & Galland, Chicago, Ill., James P. DeMaegt, Inglewood, Cal., Christopher Danch, Danch & Danch, Ojai, Cal., Craig Becker, UCLA School of Law, Los Angeles, Cal., for plaintiffs.

George Preonas, Barbara Lindemann Schlei, Hope A. Jacobson, Timothy W. Millett, Seyfarth, Shaw, Fairweather & Geraldson, Los Angeles, Cal., William S. Marrs, L. Jeanne Robbins, Marrs and Robbins, Valencia, Cal., for defendants.

## MEMORANDUM OPINION

DAVIES, District Judge.

This is a class action sex discrimination case brought pursuant to the provisions of Title VII of the 1964 Civil Rights Act, 42 U.S.C. sec. 2000e *et seq.*, and the California Fair Employment and Housing Act, California Government Code sec. 12940 *et seq.* The case concerns charges of discrimination by women employees at two lemon packing plants in Ventura County, California. The two plants were previously owned by Seaboard Lemon Association ("Seaboard") and are now owned and operated by Saticoy Lemon Association ("Saticoy").

Plaintiffs claim that Saticoy has discriminated both in hiring and in its allocation of work assignments. Specifically, the plaintiffs have asserted four types of sex discrimination at the ex-Seaboard plants: First, Plaintiffs assert that Saticoy discriminated against women in hiring from 1986 through 1988 by hiring only women for the traditional women's jobs of grader and car-ton former and filling 98% of the vacant general labor jobs with men. Second, Plaintiffs claim that Saticoy's practice of assigning all unskilled maintenance and cleaning work to the general labor classification has had a disparate impact on women because female employees have received lower amounts of regular hours, overtime hours, and gross pay as a result of this policy, which Plaintiffs contend serves no substantial business interest. Third, Plaintiffs argue that Saticoy had a duty to remedy the effects of Seaboard's prior discrimination. Finally, Plaintiffs assert that Saticoy took a series of actions when it took over the ex-Seaboard plants that had an unjustified disparate impact on women.[1]

## STATEMENT OF FACTS

The named plaintiffs are four former female employees of Seaboard. Celia Sandoval worked periodically during the years 1978 to 1982. As of December 1985, Sandoval had no recall rights at Seaboard. Rosemary Madrid worked periodically during the years 1976 to 1983. As of December 1985, she too had no recall rights at Seaboard. Sara Alvarez worked periodically during the years 1976 to 1984. Sofia Gonzales worked periodically during the years 1975 to 1985.

Until December 20, 1985, Seaboard was a non-profit agricultural cooperative which operated two packing plants in the City of Oxnard, California. It was owned by lemon growers and was in the business of processing, packing, and shipping lemons grown by its members. In 1985, Saticoy was a non-profit agricultural cooperative which owned and operated three packing houses in Ventura County for the benefit of its lemon grower members. On December 20, 1985, Seaboard and Saticoy announced a merger of their operations.[2]

1. The trial proceedings were bifurcated on April 28, 1990. During the recent trial, the Court heard evidence concerning classwide liability issues and to some extent evidence regarding the calculation of a base-line figure for possible individual class member damages. The Court has not considered questions relating purely to individual damage claims such as the establish-ment of class membership and any mitigation of damages.

2. Immediately prior to the announcement of the merger, Seaboard and Saticoy operated the following plants:

Since December 20, 1985, the Seaboard plants have been fully integrated into Saticoy's operations.

Shortly after the merger, Saticoy hired several former Seaboard employees. Although during the course of 1986 Saticoy hired a number of people to work at the ex-Seaboard plants, the plaintiffs were not hired by Saticoy. On December 18, 1986, the named plaintiffs filed charges of discrimination with the California Department of Fair Employment and Housing (DFEH), at which time the plaintiffs specified that the charges should be concurrently filed with the Equal Employment Opportunity Commission (EEOC). These charges alleged in broad terms that Seaboard and Saticoy had discriminated by maintaining "a sex segregated job structure" and confining the plaintiffs to what management allegedly felt was "women's work". The plaintiffs charged that they had been "denied job opportunities, training, assignments, promotions, compensation, opportunities for longer seasonal work or year-around work, advancement opportunities, and reinstatement after layoff by Saticoy Lemon Association and its predecessors, including Seaboard ..." The plaintiffs filed the charges on behalf of themselves and other similarly situated women employees of Saticoy. Upon receiving right-to-sue notices from the EEOC and DFEH, the plaintiffs filed the instant lawsuit on April 22, 1988, within 90 days of receiving the EEOC letter and one year of receiving the DFEH letter as required by law.[3]

Class Action

By Orders dated May 23, 1989 and July 25, 1989, the Court certified this case as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Based upon the plaintiffs' representations that Saticoy's practices are identical to the discriminatory practices they experienced while working at Seaboard and that the violations of Title VII have continued from the time they were employed at Seaboard to the present, the Court certified the four named plaintiffs as representatives of a class consisting of all former female employees of Seaboard.[4] The Court divided the class into three separate subclasses:

(1) *Rejected applicants:* This subclass is limited to all former female employees of Seaboard who applied for work anytime after April 22, 1986 but prior to February 16, 1987 at the former Seaboard plants by either written application or by verbal request and who were denied employment.

(2) *Deterred applicants:* This subclass is limited to all former female employees of Seaboard who were deterred from applying for work at the former Seaboard plants anytime between April 22, 1986 and February 16, 1987 because of their knowledge or awareness of the defendants' allegedly discriminatory policies.

(3) *Present employees:* This subclass is limited to the 33 former female employees of Seaboard who obtained employment with Saticoy anytime after December 20, 1985 but prior to February 16, 1987. In 1990, in response to a motion by plaintiffs to modify the class definition, the Court amended the definition of this subclass to include a group of approximately ten former female Seaboard employees who were hired by Saticoy in April 1987 to work at the former Seaboard plants.

Seaboard #1—600 N. Harrison Ave, Oxnard (sometimes referred to as the Colonia Blvd. plant)
Seaboard #2—600 E. Third St., Oxnard
Saticoy #1—7560 E. Bristol, Saticoy (sometimes referred to as the Montalvo plant)
Saticoy #2—348 "A" St., Fillmore
Saticoy #3—103 N. Peck, Santa Paula
After the merger, Seaboard plant 2 was referred to as Saticoy plant 4 and Seaboard plant 1 was referred to as Saticoy plant 5.

**3.** Plaintiffs filed a first amended complaint on September 30, 1988. On February 6, 1989, the Court denied leave to plaintiffs to file a second amended complaint in order to add additional named plaintiffs because the proposed women had not exhausted their administrative remedies.

**4.** The term "former female employee" is limited to those women who as of December 20, 1985 were either employed by Seaboard or who retained seniority rights at Seaboard because they had been laid off for less than two years prior to that date and had not otherwise been terminated.

### General Plant Organization

There are five general departments or areas of operation in a plant: the receiving, wash, storage, pack, and maintenance departments. The two processes which are principally at issue in this case are the wash and pack operations.

In the receiving department, employees record the receipt of lemons in large bins which weigh approximately 100 lbs and contain 900 lbs of lemons when full. Forklift operators load the bins onto machines that spill out the lemons onto rollers so that a washing process can begin.

In the wash department (or "on the wash side" to use the vernacular), lemons go through washing tanks, debris is removed, ugly lemons are separated, the lemons are waxed, and then placed on belts for grading to remove the blemished lemons and to sort the lemons by color. An electro-mechanical grading machine, supplemented by hand grading, performs this work. The lemons are stored in reusable wooden or plastic storage boxes which weigh approximately 50 lbs.

In the storage department, the boxed lemons, separated by color, are stacked and then moved by forklift into refrigerated storage rooms. When the boxes are removed, they are destacked and sent to the pack line.

In the pack department (also referred to as "the pack line" or "on the pack side"), the boxed lemons are emptied so that rotten lemons and other refuse may be removed. The remaining lemons are waxed and then divided by quality and size. The pack supervisor operates an electroscan machine that makes the initial division of fruit by quality. Additional grading is done by hand. The lemons are eventually packed into cardboard cartons by a carton filler machine and then stacked by hand onto wooden pallets in an area known as the press. These cardboard boxes contain between 37 and 44 lbs of lemons when full.

In the shipping department, the packed cartons are loaded onto trucks for shipment and the distribution of orders is recorded. The boxes may be loaded either by forklift or by hand.

The maintenance department consists of mechanics and their assistants who maintain and repair the various machines and belts in the plants.

During 1986, Saticoy employed a total of 167 employees, of which 117 were male and 50 were female. During 1987, the company employed a total of 228 employees, of which 140 were male and 88 were female. The evidence at trial demonstrated that the employees were assigned to various job classifications.

The employees who removed the rotten or ugly lemons and sort the lemons by color or quality were generally referred to as washers, sorters, packers, or graders. Employees who assembled cardboard boxes at the end of the pack line were called carton formers. At times carton forming were delegated to the employees who fell within the washer/packer categories.

General laborers performed a wide range of unskilled duties including cleaning and maintenance work such as picking up spilled lemons, cleaning empty storage boxes, washing, cleaning, and painting machinery, and washing the work areas when the lines were closed. General laborers were also responsible for the two principal lifting jobs, the loading and stacking of full cartons of lemons from the pack line onto wooden pallets, known as working the press, and the loading of trucks with cartons of lemons.

In addition to the more physically demanding jobs, there were several clerical, supervisory, and management positions at each plant. For example, night watchmen guarded the plants at night and occasionally helped to load late-arriving trucks. Employee Service Representatives acted as liaisons between employees and management on personnel matters.

The extent of operations at these plants and thus opportunity for employment varied greatly with the harvest season. The lemon harvest season runs from approximately January to June each year with the season peaking in April. During the harvest season, lemons are received and shipped so that the pack and wash lines

operate simultaneously. Toward the end of the harvest, the wash line slows down and stops running usually in June. At the lowest point in the season, only the pack line runs and it may run only occasionally during the week. General cleaning, maintenance, painting, and repair work is required during the off season and is assigned to the general labor classification.

Work schedules vary dramatically during the course of a year. At the height of the season, employees may work long shifts and earn substantial amounts of overtime. Because of the seasonal nature of plant operations, many jobs are seasonal and several employees are placed on layoff for part of the year. During the slower periods, employees may work only two days a week. Employees often do not know how long they will work on any particular day. They simply come to the plant and work until they are told the work day is over. In the off season, the reduced work force consists largely of general laborers.

Seaboard's Hiring and Employment Practices

At Seaboard, employees were generally hired and assigned to a particular job assignment pursuant to no formal policy. Employees were periodically asked to do several different tasks during the course of the season or even during the same day. For example, a woman working as an equipment operator on the pack line might be moved to the wash line to act as a grader when the pack line stopped. A man working as a storage box filler might be assigned to general labor work when the wash line was not running.

From the mid 1970's through 1985 in Seaboard's two plants, women worked almost exclusively in the grader, packer, sorter, and carton former jobs. Men performed the other jobs including general labor work, forklift operations, night watchman duties and equipment operation. Seaboard explicitly classified these jobs as "men's jobs" and the grader and sorter (or

alternatively termed washer and packer) duties as "women's jobs".[5]

Employees at Seaboard were initially assigned to their jobs by supervisors and were moved between jobs at the direction of supervisors. Women who requested additional work such as picking up spilled lemons were told that this was men's work. In denying women overtime work, supervisors told them that men had to get more work because men had families to support. Women were sent home separately from men. Women were typically laid off earlier in the season and recalled later, and would be sent home earlier in the day while men stayed to work. Gender, rather than seniority, dictated the layoff sequence.

Hiring was conducted in a similarly informal manner. A number of employees were hired after simply asking a supervisor for work. Written applications were not required. There was also no formal procedure for employees to seek a promotion or reassignment.

During the early 1980's, machines were introduced which resulted in the elimination of some of the hand grading, packing and sorting functions traditionally performed by women. The trend toward mechanization resulted in a growing disparity between the layoff patterns of men and women. By the time Saticoy took over the Seaboard plants in December 1985, women generally had to have as much as 16 years of seniority to work year round at Seaboard while men worked year round with as little as five years seniority.

There were no published seniority rules at Seaboard. Seniority lists were not posted and there was no system for arbitrating seniority disputes. Although Seaboard told its employees that it followed a general rule of laying off and recalling in order of seniority, determined by the company hire date, in practice the rule was implemented so that women were laid off in separate seniority order from men.

Recalls were performed in a highly informal manner. Seaboard employees on lay-

**5.** The one exception was the equipment operator classification in which two women worked

at Seaboard.

off would be called by telephone and told to come back to work, would learn about the availability of work from a friend, or would simply go to the plant to ask a supervisor about recall. There was no system for reapplying to return to work from layoff. An employee kept his or her seniority for two seasons even if not recalled during that time as long as he or she had not been fired, had not quit, retired, or otherwise failed to respond to a recall.

Seaboard was able to implement such informal practices because it was not bound by any collective bargaining agreement. Beginning in November 1984, Local 78A of the Fresh Fruit & Vegetable Workers, United Food and Commercial Workers Union began a union organizing campaign at Seaboard. In early 1985, the union won a representation election and became the bargaining representative for hourly production and maintenance employees at Seaboard. From April 1985 to December 1985, the union negotiated with Seaboard for a collective bargaining agreement. The union negotiator, Fritz Conle, specifically attempted to negotiate terms that he felt would alleviate some of the effects of prior discrimination against women at Seaboard.[6] The union and Seaboard reached agreement on a proposed contract on December 17, 1985. The union membership ratified the proposed contract and on December 20, 1985, Seaboard's negotiator sent Fritz Conle a letter which stated that Seaboard recognized the existence of the collective bargaining agreement.

### Saticoy's Acquisition of the Seaboard Packing Plants

On December 20, 1985, Seaboard announced the merger of its operations with Saticoy. Pursuant to the merger agreement, Seaboard ceased all operations and terminated all of its employees effective December 20, 1985. Saticoy acquired all of Seaboard's assets and immediately began to operate the two Seaboard plants under the Saticoy name. A formal merger agreement was filed with the California Secretary of State on May 31, 1986.

Despite the union's efforts to enforce the collective bargaining agreement negotiated with Seaboard, Saticoy refused to recognize the contract. An enforcement action brought by the union against Saticoy before the National Labor Relations Board was unsuccessful.

Although Saticoy rejected the union contract, Saticoy was aware, or given the history of discrimination at Seaboard should have been aware, of the union's charges of discrimination against Seaboard prior to the merger arising from the company's hiring, layoff, and work assignment practices. A boycott which the union had organized against Seaboard products to protest the alleged sex discrimination prior to the merger was continued against Saticoy products after the merger. The National Organization of Women sought to expand this boycott to all Sunkist products. Several articles were published in newspapers in Ventura County on these problems and the Union organized public demonstrations and the distribution of handbills and press re-

---

**6.** Some of the key terms in the collective bargaining agreement designed to ameliorate the effects of Seaboard's discriminatory treatment of its female employees included the following:
(1) Employees who had lost seniority due to an extended layoff, predominantly women, would be given preference for hiring before any new employees were hired.
(2) Employees on layoff would be recalled from layoff in order of company seniority into both the general floor and washer/packer jobs.
(3) Promotions would be made according to company seniority.
(4) If an employee moved into a higher level job and then was subject to layoff, he or she could bump back down into the washer/packer or general floor job.

(5) A pay raise would be instituted so that the washer/packer classification would no longer be the lowest paid job.
(6) Seaboard would be required to post seniority lists by company hire dates and classification hire date.
(7) All jobs available to be filled through promotion would be filled through a posting-and-bidding system.
(8) The heavy general floor jobs of loading cartons onto pallets and loading trucks would be placed into a separate job classification called hand stacker.
(9) A specific provision against sex discrimination would be inserted into the employment contracts.

leases. Furthermore, many Seaboard Board members who had directly confronted this issue became Saticoy Board ·members after the merger. The merger agreement expressly stated that Saticoy had investigated the labor relations matters at Seaboard including the proposed union contract, labor negotiations, and actual or threatened boycotts.

Saticoy accepted any potential liability for Seaboard's discriminatory activities. The merger agreement specified that "Seaboard shall be merged with and into Saticoy ... the surviving association shall succeed, without any transfer, to all the rights and property of Seaboard and shall become subject to all debts and liabilities of Seaboard." The agreement further provided for the allocation of liability for potential backpay claims between Saticoy and ex-Seaboard members of Saticoy; the ex-Seaboard Board members were designated solely liable for such claims in excess of $100,000.00.

At the time of the merger, Saticoy decided to close Seaboard plant 1, which became Saticoy plant 5, for renovation. However, fruit in storage at the second Seaboard plant required immediate handling and thus necessitated the use of Seaboard plant 2.

Rather than opening up the jobs to its own employees, Saticoy offered the jobs to ex-Seaboard employees who were working at Seaboard on December 20, 1985. Written notice was given to active Seaboard employees on December 20, 1985 about the job classifications for which Saticoy was accepting applications and the correlating rates of pay, which were lower than at Seaboard. The notice indicated that persons interested in employment would need to fill out applications at Saticoy's plant 1 on December 21, 1985. The notice further stated that Seaboard employees would be "considered based upon their experience and ability to perform the job functions." A similar notice was posted at Saticoy plant 1 on December 21, 1985. Employees on recall were not given any formal notice of this hiring. Saticoy made no effort to recall or contact these employees in any manner or otherwise inform the employees of their recall status.

On December 21, 1985, Saticoy accepted applications from all persons who appeared at its plant 1. Saticoy continued to accept a few applications from former Seaboard employees during the following week. Saticoy notified the ex-Seaboard employees that any applicant accepted for employment at Saticoy would be notified no later than December 27, 1985.

As a result of the December 1985 hiring, Saticoy hired 84 ex-Seaboard employees (excluding managerial and supervisory personnel) comprised of 33 women and 51 men. Most of the ex-Seaboard supervisory employees were offered employment at Saticoy. The recall rights of those Seaboard employees on layoff were terminated so that ex-Seaboard employees would have no greater right to employment at the two plants than any other person applying for work.

Saticoy's Hiring and Employment Practices

Prior to 1985, Saticoy's employment practices to a large extent mirrored those practices employed by Seaboard. In 1985, however, Saticoy implemented certain procedural changes, such as a posting and bidding system whereby employees would be notified of job vacancies and could seek to transfer to another job classification. At Saticoy, new employees participated in an orientation during which they are given information about Saticoy's terms and conditions of employment and various rules and procedures. They received an employment handbook which expressly stated that Saticoy did not discriminate on the basis of sex. The only seniority rule publicized to employees was a general statement in the employee handbook that Saticoy considered seniority a major factor in promotion, layoff and recall.

When vacancies arose, Saticoy gave preference to its present employees through the posting and bidding system. Saticoy maintained an informal policy whereby employees who transfer to a new job classification were given a thirty day trial period during which time they could elect to re-

turn to their old job without penalty. This policy was not published or written anywhere. Although employees were told about the rule, many did not learn about it until after they had already bid on a job.

Despite the few operational differences between Seaboard and Saticoy, Saticoy, upon its merger with Seaboard, recreated many of the conditions which had existed at Seaboard. The ex-Seaboard employees hired by Saticoy were placed into the same positions which they had held at Seaboard. Ex–Seaboard employees worked predominantly under the same supervisors employed by Seaboard, including those supervisors who had told female employees that they were not wanted in men's jobs. At the time of the merger, Seaboard employees were not informed of these specific changes in policy. Saticoy did not inform ex-Seaboard employees that it would change Seaboard's pattern of job assignments in which men and women were employed in separate job classifications and women were told that certain tasks were appropriate only for men.

After the initial hiring in December 1985, Saticoy followed its usual hiring procedures. Saticoy accepted applications from the public only after job vacancies had been posted for bidding by Saticoy employees. Between January 1 and April 22, 1986, Saticoy recalled many of its own employees who had been laid off from plants 1, 2 and 3. Both male and female employees were invited to transfer into available positions at all plants, including plant 4. During this time, three ex-Seaboard graders were transferred into the general labor job. There is no evidence that Saticoy denied any present employee class member a request for transfer or promotion to the general labor job classification.

At some time between 1986 and 1989, Saticoy's President Glenn Miller, then Operations Manager, wrote formal job descriptions for the job classifications at Saticoy, including *inter alia* the classifications of grader, carton former, general labor, forklift operator, equipment operator, mechanic, and night watchman. These descriptions were not published to the employees.

In 1988, Glenn Miller drafted a proposed job description for a loader classification. Traditionally, the general labor job classification encompassed the two heavy lifting tasks. Due to the qualitative difference between the lifting duties and other general labor tasks, Mr. Miller considered the possibility of a separate job classification designed to encompass the lifting duties. While the creation of such a classification would not have interfered with the smooth and efficient operation of Saticoy's plants, the strenuous nature of the work may have necessitated a different, and probably better, compensation package. For no apparent reason, the concept was never implemented at Saticoy.

Through 1989, the women general laborers at Saticoy were assigned a limited amount of general labor duties. While these women were assigned cleaning, repairing, painting, and other similar tasks, they were not given any of the loading duties.

In 1990 in response to this lawsuit, Saticoy offered employment in the general labor classification to class members. Women who were not class members were denied an opportunity to apply for these jobs. Approximately 16 class members accepted employment as general laborers. While general laborers in 1986 were started at a pay rate of $5.70 per hour, these women were offered a starting rate of $5.45. None of the women were given any credit for seniority. Furthermore, unlike the previous female general laborers, the women hired in 1990 as general laborers were required to participate in the loading activities.

### DISCUSSION

Title VII protects employees against employment practices which adversely affect an individual's status as an employee, because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. sec. 2000e–2(a). Title VII in relevant part provides that:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way that would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.[7]

Title VII precludes two types of discrimination. When an employer treats some employees less favorably than others, the discrimination is labeled "disparate treatment". Proof of discriminatory motive is critical, although in some situations it can be inferred from the mere fact of difference of treatment. The Supreme Court has found that disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The second type of discrimination concerns claims of disparate impact. This theory of discrimination involves employment practices which are facially neutral in their treatment of differ-

ent groups but which in fact fall more harshly on one group and cannot be justified by business necessity or some other legitimate business justification. Proof of discriminatory motive is not required under a disparate impact analysis. *Id.*

■ Saticoy qualifies as an employer within the meaning of section 701(b) of Title VII, 42 U.S.C. sec. 2000e(b) and as defined in the California Fair Employment and Housing Act, Cal.Gov't Code sec. 12926. However, Seaboard ceased to exist in May 1986 when the Seaboard–Saticoy merger agreement was filed with the California Secretary of State. More importantly, as of December 20, 1985, Seaboard ceased to be engaged in the lemon packing industry. The fact that Saticoy succeeded to Seaboard's liability does not mean that Seaboard continued to exist. The plaintiffs have acknowledged that the pleading of Seaboard as a defendant was largely symbolic. Seaboard did not act as an employer within the 300 day charge filing period and is not directly responsible for any discriminatory act during this time. If, however, Seaboard discriminated against female employees prior to the merger and Saticoy continued the discriminatory practices after taking over the Seaboard plants, such discrimination, though outside the charge filing period, may be actionable. Although the plaintiffs cannot look to the now defunct Seaboard for relief, Saticoy remains liable for the acts of Seaboard under both state and federal law.[8]

---

**7.** California law similarly provides in pertinent part:

It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

(a) For an employer, because of ... sex ..., to refuse to hire or employ for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment.

California Government Code, section 12940.

**8.** California state law provides that "[u]pon merger ... the separate existence of the disappearing corporations ceases and the surviving corporation shall succeed, without other trans-

fer, to all the rights and property of each of the disappearing corporations and shall be subject to all the debts and liabilities of each in the same manner as if the surviving corporation had itself incurred them." *Cal.Corp.Code* sec. 1107(a).

According to federal law, the doctrine of successor liability applies to Title VII cases. *Bates v. Pacific Maritime Ass'n,* 744 F.2d 705, 708 (9th Cir.1984); *Slack v. Havens,* 522 F.2d 1091, 1094–95 (9th Cir.1975). The factors that a court must consider before determining whether successor liability should be imposed include (1) the continuity in operations and work force; (2) notice to the successor employer of the predecessor's legal obligation; and (3) the ability of the predecessor to provide adequate relief directly. *Bates,* 744 F.2d at 709–10.

In this case, an analysis of the three factors supports a finding of successor liability. Sati-

Relief under Title VII is dependent upon the timely filing of an administrative charge; failure to file within the statutory period will usually operate as a bar to a lawsuit under the statute. *See e.g. United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). The threshold issue presented to the Court is whether the named plaintiffs timely filed their charges with the state and federal agencies to avoid any bar to their claims.[9]

■ Title VII provides that a party alleging employment discrimination must file a claim with the EEOC "within 300 days after the alleged unlawful practice." 42 U.S.C. sec. 2000e–5(e).[10] Under California law, before a party may file a charge with the EEOC, he must first pursue his claim with the DFEH. California Gov't Code, section 12961. While the DFEH forwards the charge to the EEOC, the charge is not deemed filed with the EEOC until (a) the time when the DFEH completes its investigation or (b) 60 days following the complainant's filing of the charge with the DFEH, whichever date is earlier. *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

The plaintiffs filed their charges of discrimination with the DFEH on December 18, 1986 with directions that the charges be cross-filed with the EEOC. The agency completed its investigation on April 29, 1987. Pursuant to *Mohasco,* the plaintiffs' charges were deemed filed with the EEOC on February 16, 1987, 60 days after the filing of their charges with the DFEH. Thus, the plaintiffs' charges were filed timely with the EEOC only if the alleged discriminatory acts occurred within the 300–day period preceding the date on which the charges were filed. Since the effective filing date was February 16, 1987, the plaintiffs must have suffered discrimination at some time after April 22, 1986 but before February 16, 1987. The plaintiffs' charges were timely under state law if the plaintiffs were subject to discrimination on or after December 18, 1985, within one year of the date they filed their charges with the state agency.

■ To decide whether the plaintiffs timely filed their charges of discrimination, the Court must determine when their claims arose. While the limitations period in Title VII is intended to guarantee "the protection of the civil rights laws to those who promptly assert their rights", it is also intended to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980) (limitations period began to run when the college denied the plaintiff professor tenure, not on the date of his ultimate discharge from the college several years later). Generally, the applicable 180 or 300 day period begins to run when facts

coy continued the Seaboard operation as a part of a consolidated cooperative. There is no doubt that Saticoy had actual notice of Seaboard's potential liability. The plaintiffs' claims had been widely publicized throughout Ventura County and had received public support from the Ventura County Democratic Committee, National Organization of Women and the local press. The defendants knew as early as September 1985 that former Seaboard women intended to sue and thus made Seaboard's potential liability for backpay a subject of the merger negotiations. Saticoy included an indemnification provision in the merger agreement to protect itself against any potential liability for Seaboard's alleged discriminatory acts. Although the plaintiffs' discrimination charges were not pending at the time of the merger, Saticoy was aware that such a lawsuit was contemplated.

9. It is well settled that a named plaintiff who has filed a timely charge may bring a class action on behalf of class members who have not filed charges. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975). Although in a class action the individual class members are not required to file individual charges, the representative plaintiffs must have filed timely charges in order to proceed with the class action. *Inda v. United Air Lines, Inc.,* 565 F.2d 554 (9th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). A class representative's EEOC complaint tolls the statute of limitations for all class members. *Id.* at 559.

10. The statutory period is 300 days only in jurisdictions that have a state agency with authority to grant relief from discriminatory employment practices. California is such a state. If the state has no such agency, the statutory period is 180 days. 42 U.S.C. sec. 2000e–5(e).

that would support a charge of discrimination are apparent or should be apparent to a person with reasonably prudent regard for his rights. *See Serpe v. Four–Phase Systems, Inc.,* 718 F.2d 935, 937 (9th Cir. 1983). This rule, however, may not apply in cases where the discrimination occurs over a significant period of time.

■ In *Serpe,* the female plaintiff's several requests to transfer into a management position were all denied because she was a woman. The district court refused to reach the merits of the claim because the plaintiff had not adequately filed a charge alleging this form of discrimination and the claim was time-barred due to the plaintiff's failure to file a charge of discrimination within 300 days of the date her last request for transfer was denied. The Ninth Circuit reversed and in so doing, distinguished an unlawful employment practice that manifests itself over time from a discrete act of discrimination, such as an act of firing or refusal to hire. A single isolated act of discrimination starts the statute of limitations running because a lay person should have perceived the discrimination occurring. However, where there is a systematic policy of discrimination, a challenge may be timely even though the plaintiff was subject to discrimination prior to the charge filing period. *Id.*

Thus, the fact that the plaintiffs may have been aware of the discriminatory practices at Seaboard prior to the charge filing period does not necessarily render the filing of their claims untimely. Where a plaintiff is not complaining of a discrete act of discrimination, the doctrine of continuing violations may exempt the plaintiff from the strict requirements of Title VII. "The continuing violation theory recognizes the principle that a plaintiff may be able to recover under Title VII if he or she can demonstrate a pattern or practice of discrimination that has continued into the present, notwithstanding his or her ability to prove specific instances of the discrimination personally suffered at the hands of the defendant within the limitations period of Title VII." *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1443, *modified,*

742 F.2d 520 (9th Cir.1984). A reasonably prudent person may not necessarily conclude that an employer is discriminating against him on the basis of one conversation or act. *See Abrams v. Baylor College of Medicine,* 805 F.2d 528, 534 (5th Cir. 1986). In those instances where a plaintiff has no reason to believe he was a victim of discrimination until a series of adverse actions establish a pattern of discriminatory treatment, a court may treat a series of separate violations as a single continuing violation. *See Maholtra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989). In this case, the plaintiffs contended that they did not realize that Saticoy had discriminated against them until they began to recognize a pattern at Saticoy, similar to the more overt policy which existed at Seaboard, of treating female applicants and employees different from male applicants and employees.

■ "In order for a violation to be continuing, it must involve a practice, continued over a period of time, which operates to injure the plaintiff either individually or as a member of a class to which the plaintiff belongs." *Id.; see also Valentino v. United States Postal Service,* 674 F.2d 56, 65 (D.C.Cir.1982) (to demonstrate a continuing violation, a plaintiff must show a series of related acts and that one or more of those acts falls within the limitations period). "To establish a continuing violation, a plaintiff must show a substantial nexus between the time-barred acts and the time-asserted acts." *Robinson v. Caulkins Indiantown Citrus Co.,* 701 F.Supp. 208, 211 (S.D.Fla.1988).

In *Roberts v. North American Rockwell Corp.,* 650 F.2d 823 (6th Cir.1981), the Sixth Circuit rejected the defendant's argument that the plaintiff's charge was untimely because she had learned of Rockwell's discriminatory policy more than 300 days before filing her charge; instead, the Court held that the plaintiff's charge was timely because the policy had continued into the charge-filing period and resulted in plaintiff's exclusion from employment. *Id.* at 826–28. As the court explained: "The issue becomes more difficult when a com-

pany fails to hire or promote someone because of their race or sex. In many such situations, the refusal to hire or promote results from an ongoing discriminatory policy which seeks to keep blacks or women in low-level positions or out of the company altogether. In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine." *Id.* at 826.

"The critical question is whether any present violation exists." *United Air Lines, Inc. v. Evans,* 431 U.S. at 558, 97 S.Ct. at 1889. While the continuing violation theory relieves a plaintiff from having to prove that the entire violation occurred within the actionable period, *Abrams v. Baylor College of Medecine,* 805 F.2d at 532–33, a plaintiff must be able to show a present and ongoing violation of Title VII as opposed to the continued effects of past discrimination. *United Air Lines, Inc. v. Evans,* 431 U.S. at 558, 97 S.Ct. at 1889. In *Evans,* a stewardess who was discharged when she married under a "no marriage for stewardesses" rule lost her seniority when she was rehired after the rule was invalidated. The Supreme Court held that although the seniority system at issue in the case perpetuated the effects of past discrimination by having a continuing discriminatory impact on the plaintiff's pay and fringe benefits, the system itself was gender neutral and did not result in discrimination. Since the plaintiff could not demonstrate a continuing violation, her claim was time-barred.

In a continuing violation case, a court need not look to the date on which a plaintiff first became aware or should have been aware of a discriminatory act. If a defendant has practiced a policy of discrimination over an extended period of time, a court must only determine whether the plaintiff was exposed to discrimination during the charge filing period. A victim of discrimination must show that the company policy had an adverse impact on him during the limitations period or the continuing violation theory is "of no assistance or applicability because mere continuing *impact* from past violations is not actionable. Continuing violations are." *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918 (9th Cir.

1982), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 citing *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 760 (9th Cir.1980). In order to avoid exposing an employer to an open-ended period of liability, it is appropriate that a plaintiff show some application of the illegal policy to him within the 300 days preceding the filing of his complaint. "If mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely." *Abrams v. Baylor College of Medecine,* 805 F.2d at 533.

■ Saticoy's argument that the plaintiffs cannot rely on the continuing violation theory because no Seaboard act could have occurred within the charge filing period because Seaboard ceased operations on December 20, 1985 is misplaced. Since Saticoy is liable for all past discriminatory Seaboard practices which it adopted, the plaintiffs need only show that Saticoy's employment practices continued to be discriminatory after the merger and that the plaintiffs suffered from the defendant's discrimination sometime during the limitations period.

■ The fact that the plaintiffs were informed that they would not be hired in December 1985 or early 1986 is not determinative if the plaintiffs continued to apply for or inquire about employment. In *Roberts v. North American Rockwell Corp.,* the Sixth Circuit found "no reason to formalistically require an applicant to continuously apply, only to be continuously rejected." 650 F.2d at 827. In *Roberts,* the Court found that the plaintiff's repeated oral inquiries about her application on file with the company was empirical proof that she was continuously applying and being continuously rejected. Although Saticoy maintained a policy that written applications expired after 30 days, the evidence demonstrated that this policy was not an absolute rule. Certain male applicants were hired several months after they submitted written applications to Saticoy. Furthermore, the plaintiffs had no reason

to know immediately after the merger about Saticoy's policy requiring written applications. The plaintiffs followed the Seaboard practice of making oral inquiries about employment and only realized the futility of such requests after several months.

The plaintiffs argued at trial that they were subject to a discriminatory hiring policy that continued well into the charge-filing period.[11] The plaintiffs applied or otherwise inquired about employment at Saticoy to no avail; despite their availability for work and prior experience at the Seaboard plants, men who had never worked for Seaboard or Saticoy were hired as general laborers instead of the plaintiffs and similarly situated women.

The evidence at trial showed that Saticoy hired men for unskilled general labor jobs for which Plaintiffs had applied or were deterred from applying and for which they were qualified. Sara Alvarez testified that she repeatedly asked for work in 1986 and was told by Saticoy supervisors that Saticoy was not hiring. Sofia Gonzales submitted a written application on December 21, 1985; after trying to renew or update her application, she was deterred from trying again after being told by a supervisor that there would never be work for her at Saticoy. While Rosemary Madrid never filled out a written application, she applied orally at a Saticoy office and was told in early 1986 that Saticoy had hired enough people. Yet, 45 male general laborers were hired in the first six months of 1986. The plaintiffs testified that they were interested in any work. The fact that Saticoy traditionally hired women only as graders and sorters does not render their general requests for work any less effective. Discrimination occurred during the charge filing period simply by Saticoy's apparent refusal to consider women as candidates for the general labor jobs.

Therefore, the plaintiffs filed charges of hiring discrimination with the EEOC well within the statutory period because during the 300 days prior to the filing of their EEOC charges, men were hired by Saticoy to fill jobs that the plaintiffs were qualified to perform and for which they had or would have applied but for the deterrent effects of Seaboard and Saticoy's actions. The plaintiffs were impacted by Saticoy's hiring policy during the charge filing period and did not merely suffer the effects of Seaboard's earlier wrongful acts. On the facts of this case, the plaintiffs have adequately demonstrated that Saticoy continued to violate Title VII in its hiring practices.[12]

■■ Having determined that the plaintiffs' hiring claims were timely filed, the Court must now examine the timeliness of the remaining claims. Neither party addressed the impact of a finding that one claim was timely filed on the timeliness of the plaintiffs' other claims. The extent to which the application of the relevant statutes of limitations to these claims may be governed by the Court's finding of a continuing violation is particularly important since the plaintiffs were not directly effected by Saticoy's employment policies during the charge filing period.

The plaintiffs proved that the continuing violation theory applied to their hiring claim by showing that Saticoy essentially adopted Seaboard's sex segregated hiring practices. Because the plaintiffs applied or were deterred from applying for a job at Saticoy within the charge filing period, they asserted timely claims and were appropriate representatives for the class members who comprised the rejected and deterred applicant subclasses. However,

---

**11.** Plaintiff Celia Sandoval never appeared at trial and introduced no evidence. Although a member of a protected class, Sandoval failed to meet her burden of showing that she was subject to any discrimination by Saticoy, either during or before the charge-filing period. Even if Sandoval's claims were not time-barred because she had in fact suffered discrimination during the charge filing period, the Court finds

that Sandoval cannot prevail on any theory of discrimination in the absence of any evidence.

**12.** As a prerequisite to obtaining relief, each class member will have to demonstrate that she suffered from Saticoy's hiring policy during the limitations period. *See Domingo v. New England Fish Co.,* 727 F.2d at 1443.

while the plaintiffs in essence requested work during the statutory period, there was no evidence at trial that the plaintiffs were subject to discrimination as a result of Saticoy's work assignment policies. They never received fewer hours or lower wages than their male counterparts because they never worked for Saticoy.

Prior to trial, the Court struggled with the appropriateness of the named plaintiffs as class representatives for the subclass of former female Seaboard employees who became present employees at Saticoy. The plaintiffs argued that their interest in obtaining work in the traditionally male jobs was aligned with the similar interests of the present employee subclass. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) (a class representative must be a part of the class he or she seeks to represent, possess the same interests, and suffer the same injury as class members). Because the plaintiffs had worked for Seaboard and were familiar with its practices and in light of Saticoy's alleged adoption of those practices at the time of the merger, the Court certified the subclass in order to give the plaintiffs an opportunity to pursue their continuing violation theory.

At trial, however, the plaintiffs offered no evidence to demonstrate that they had been injured by Saticoy's employment policies, as opposed to hiring practices, during the 300 days preceding the filing of their federal charges or the one year prior to the filing of their state charges. Since they were never employed by Saticoy and not employed by Seaboard at the time of the merger, the plaintiffs were clearly incapable of presenting such evidence. Thus, the Court must determine whether the fact that the plaintiffs were not victims of the discriminatory impact of Saticoy's work assignment practices within the charge filing period renders these claims time-barred. *See Williams v. Owens-Illinois, Inc.,* 665 F.2d at 924) (the benefit of the continuing violation theory may not apply to complainants who have ceased to be employees or never were employees in certain cases be-cause these individuals may never have been affected by certain company policies).

Title VII is broad remedial legislation which is intended to be liberally construed. *Silver v. KCA, Inc.,* 586 F.2d 138 (9th Cir.1978). However, statutes of limitations "are to be strictly construed and the court must find the intention of the Legislature from the statute itself." *Estrella v. Brandt,* 682 F.2d 814, 818 (9th Cir.1982).

The parties never specifically addressed the question of whether the different claims of discrimination were simply alternative theories of liability under Title VII for the purpose of the statute of limitations or whether the plaintiffs' disparate treatment and disparate impact claims were essentially analogous to different causes of action which each had to satisfy the statutory limitations period. Since the plaintiffs alleged a continuing environment of discrimination which Saticoy adopted from Seaboard, the plaintiffs obviously assumed that a finding of a continuing violation of one type of discrimination, in this case Saticoy's hiring policy, implied that the other alleged discriminatory practices had continued over time. Despite this assumption, the plaintiffs overlooked the fact that the representative plaintiffs were never victims of Saticoy's alleged discriminatory work assignment policies; instead, they relied on the fact that the plaintiffs had suffered similar discrimination at Seaboard and thus were adequate representatives of those former female Seaboard employees who were disparately impacted by Saticoy's employment policies.

The Court cannot agree with this reasoning. The continuing violation theory is intended to allow a plaintiff to sue on the basis of several related acts, perhaps only one of which falls within the limitations period. However, the Court does not find that the plaintiffs' claim for discriminatory hiring is related to the claim that Saticoy's work assignment policies disparately impacted its present employees. Unlike the issue of class representation, the Court is not reevaluating the adequacy of the plaintiffs as class representatives for the claims of the subclass of present employees. In-

stead, the Court is simply asking whether each type of discrimination charged, and the event or events which comprise the foundation for the charge, comprise a separate claim for the purposes of a statute of limitations analysis.

Title VII specifically provides that a "charge under this section shall be filed within one hundred and eighty days after the alleged unemployment practice occurred ..." 42 U.S.C. sec. 2000e–5(e). Title VII creates a private cause of action for claims of discrimination in an employment context. Each claim, however, applies to separate and distinct actionable conduct. While the statute confers a general authority to sue, every possible type of discrimination is not subsumed within a global cause of action for discrimination under Title VII. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. at 159, 102 S.Ct. at 2371 (Title VII prohibits discriminatory employment practices, not an abstract policy of discrimination). As such, the statutory limitations period applies to each claim of discrimination giving rise to a Title VII cause of action.

While a pattern of discrimination which supports a finding of a continuing violation will provide for the consideration of discriminatory incidents outside Title VII's limitations period, those incidents must relate to the essence of the continuing violation. In this case, the plaintiffs' charge of discriminatory hiring and charge of discriminatory work assignment practices do not entail the same subject matter discrimination. *See Robinson v. Caulkins Indiantown Citrus Co.,* 701 F.Supp. 208 (S.D.Fla. 1988) (plaintiff's claim of disparate wages is not the same subject matter as her claim of wrongful refusal to hire). In *Robinson,* the district court rejected the plaintiffs' argument that "because the discrimination was wide-spread and continuous with regard to the class as the whole, those individuals who suffered past discrimination that would otherwise be time-barred can still seek recovery for the past violations since they were part of the overall continuous discrimination." *Id.* at 212. The court found that the argument reached too far because each time a Title VII case was

filed, there would be no effective time limitations. *Id.*

The Court applies this reasoning to the instant case. To revive the time-barred claims, the plaintiffs had the burden of proving that they were part of a pattern or continuing practice out of which the timely filed incidents arose. *See Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793 (11th Cir.1988), *modified on reh'g,* 850 F.2d 1549 ("The continuing violation doctrine does not give a second chance to an employee who allowed a legitimate Title VII claim to lapse."). The plaintiffs cannot use the continuing violation theory to bring their otherwise time-barred claims against Saticoy's work assignment policies within Title VII's limitations period. Because the plaintiffs were not victims of such discrimination within 300 days of the filing of their administrative charges, this disparate impact claim is time-barred. Even if Saticoy's work assignment policies were discriminatory, the plaintiffs did not overcome the attendant statute of limitations problems with their claims. Thus, the plaintiffs cannot challenge Saticoy's work assignment practices on behalf of the subclass of present employees.

Similarly, the plaintiffs' claim that Saticoy's post-merger decisions to hire only active Seaboard employees at the time of the merger and to cut off the recall rights of Seaboard employees on layoff may be time-barred under Title VII. These decisions, although probably made by Saticoy prior to the merger, were implemented by the company in late December and early January 1986. Although the alleged discriminatory decisions were made prior to the federal charge filing period, Saticoy's actions clearly fall within the state limitations period and thus, the plaintiffs' charges are timely under California law. This question becomes more difficult to answer under federal law.

▇ At the time of the merger, Saticoy made no efforts to notify Seaboard employees on layoff that their recall rights were extinguished by the Seaboard–Saticoy merger. The plaintiffs perceived· no

change in the operation of the plants under Saticoy and Seaboard. In light of the superficial similarity between the plants under the operation of the two companies, the plaintiffs did not realize that they were no longer subject to recall until April 1986 or later, particularly since most layoffs occurred during the winter months and recalls in the summer months. While Saticoy's hiring of only active employees was patently obvious in December 1985, the plaintiffs did not consider the action discriminatory in December 1985 because they were unaware that their recall rights no longer existed.

At the time of the merger, only plaintiffs Sara Alvarez and Sofia N. Gonzales had seniority at Seaboard which entitled them to recall rights. Thus, only these two named plaintiffs can proceed with this claim since neither Celia Sandoval nor Rosemary Madrid have standing to bring this claim on behalf of the class. Any injury resulting from the disparate impact of Saticoy's post-merger decisions would have been felt by the plaintiffs during the charge filing period if new employees were being hired when former Seaboard employees on recall would have been entitled to the available jobs. Since this claim is essentially a variation of the plaintiffs' hiring claims which fall within the continuing violation exception to Title VII's statute of limitation, the Court finds that this claim of disparate impact is not time-barred under either federal or state law.

Hiring Discrimination

The plaintiffs argued at trial that Seaboard and then Saticoy regularly and systematically discriminated against women in hiring because of their sex. The Supreme Court has "consistently used conventional disparate treatment theory, in which proof of intent to discriminate is required, to review hiring and promotion decisions that were based on the exercise of personal judgment or the application of inherently subjective criteria." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). The central focus of a disparate treatment inquiry is whether an employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Bro. of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977).

In *McDonnell–Douglas Corp. v. Green*, the Supreme Court established the basic allocation of burdens and order of proof in a Title VII case alleging discriminatory treatment. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must demonstrate a prima facie case of intentional discrimination by a preponderance of the evidence. Second, if the plaintiff succeeds, the burden of production shifts to the defendant to articulate legitimate, non-discriminatory reasons for his decisions. Third, if the defendant carries this burden, the plaintiff must then establish that the reasons offered by the defendant were simply a pretext for discrimination. 93 S.Ct. at 1825. While the burden of proving a prima facie case of disparate treatment is not onerous, the ultimate burden of persuading the trier of fact that a defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In order to establish a *prima facie* case of discriminatory refusal to hire, a plaintiff must prove: (1) that he belongs to a protected minority group; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications he was rejected; and (4) the position remained open and the employer continued to seek applicants from persons with the plaintiff's qualifications. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Supreme Court has recognized the need for flexibility in applying the *McDonnell–Douglas* guidelines to different fact situations. *Id.* at 802, n. 13, 93 S.Ct. at 1824, n. 13. ("[t]he facts necessarily will vary in Title VII cases, and [this four-part test] is not necessarily applicable in every respect to differing factual situations."). Since the female plaintiffs and class members in this case

are clearly part of a protected group, the Court must focus on the nature of the application process at Seaboard and Saticoy and the defendants' hiring behavior.

There is no requirement in *McDonnell–Douglas* that a plaintiff's application for work be in writing. A verbal inquiry or request for work has been held adequate to satisfy the *prima facie* case requirements where a defendant has turned an applicant away without permitting her to file an application or where other evidence shows that the plaintiff expressed an interest in a position and should have been considered for it. *Int'l Bro. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In fact, a plaintiff's "casual inquiry" regarding a sales position may be sufficient to establish a *prima facie* case of sex discrimination. In holding that a person could be entitled to relief under Title VII without a formal application, the Supreme Court reasoned that an employer's policy of discrimination "can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his response to casual or tentative inquiries, and even by the ... composition of that part of his work force from which he has discriminatorily excluded members of minority groups." *Int'l Bro. of Teamsters v. United States*, 431 U.S. at 365–67, 97 S.Ct. at 1869–71. In *Holsey v. Armour & Co.*, 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 for example, the Fourth Circuit concluded that since the defendant company had no black employees in sales positions at the time of plaintiff's inquiry and had actively discouraged them from applying for sales jobs, plaintiff's claim was clearly within the *Teamsters'* standard.

Thus, a plaintiff's failure to apply formally for a job will not preclude a valid claim for discriminatory hiring. A plaintiff need not show that she applied for a position at all if she can demonstrate that she was deterred from applying by knowledge that her application would be futile because of the defendant's discriminatory policies or if there was no consistent application process. As the Supreme Court stated in *Int'l Bro. of Teamsters v. United States*, 431 U.S. at 365–66, 97 S.Ct. at 1870: "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection ... When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *See also Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1154 (9th Cir.1982) (The plaintiff's allegation that an application would have been futile because of the defendant's prior refusal to hire women for the position which she sought was sufficient to state a claim.).

Generally, a nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for a job by the employer's discriminatory practices, such a plaintiff must prove "that he would have applied for the job had it not been for the defendant's practices." *Teamsters* 97 S.Ct. at 1871. In *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the Supreme Court found that the black plaintiffs had proven a *prima facie* case of racial discrimination even though they had not actually applied for a job with the defendant since "they did everything within their power to apply for employment...." In *Reed v. Lockheed Aircraft Corp.*, the Ninth Circuit held that even though the plaintiff never applied for a promotion, she could establish a *prima facie* case of discrimination if she could show that because of Lockheed's discriminatory policy, women found it futile to apply for a promotion or for admission to a training program. 613 F.2d at 761.

In support of their claim, the plaintiffs introduced statistics derived directly from Saticoy's personnel and payroll records which reflected a glaring disparity in hiring according to sex. *See Int'l Bro. of Teamsters v. United States,* 431 U.S. at 339, n. 20, 97 S.Ct. at 1856, n. 20 ("Courts have frequently relied upon statistical evidence to prove a violation ... In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved."). From 1986 through 1988 at Saticoy plants 4 and 5, women were hired only to fill the traditional "female" jobs of grader and carton former. At the same time, men were hired to fill all but approximately 2% of the traditionally male general labor jobs. During this period, Saticoy hired 147 new general laborers and 144 of them were men. Evidence of severe statistical disparities creates an inference of discrimination which a defendant cannot rebut "by merely pointing to flaws in the plaintiff's statistics." *E.E.O.C. v. General Telephone Co. of Northwest,* 885 F.2d 575, 581 (9th Cir.1989), *petition for cert. filed,* June 4, 1990 (No. 89–1900).

Any argument that women never applied for general labor job openings misses the point. Saticoy's head of Employee Relations, Jennie Castro, testified that numerous men and women came into the office to ask for work—even when Saticoy was not hiring. A review of the applications for 1986 shows that Saticoy received applications almost every week during the first six months in 1986. Many applicants completed their applications with help from Saticoy personnel. Yet, when women expressed a willingness to work in any job opening, their application reflects a request for work as a grader or carton former; some women were simply told to write down grader or sorter. Men, on the other hand, who indicated a willingness to work in any position were directed to the general labor classification. Even though Saticoy was often accepting applications and hiring general laborers, women were told that Saticoy was not hiring when only general labor jobs were available.

It is clear from the statistics and testimonial evidence that Saticoy did not consider women for the general labor positions. Several women testified that supervisors told them general labor work was inappropriate for women. Some of these supervisors were the same individuals who indicated that Saticoy was not hiring. Saticoy never reached a determination about the particular qualifications of an individual female applicant because Saticoy concluded that general labor work was unsuitable for women. Yet, the general labor job is an entry level position which requires little specialized skill or training. While there is a component of physical labor involved because a general laborer must be able to lift storage boxes containing 50–60 pounds of lemons from time to time, Saticoy produced no evidence that women were incapable of doing this work. Saticoy never attempted to prove that sex was a *bona fide* occupational qualification for working in the general labor classification. *See Gifford v. Atchison, Topeka and Santa Fe Ry. Co.,* 685 F.2d at 1155 (defendant has the burden to prove that heavy lifting renders sex a bona fide occupational qualification under Title VII).

Saticoy's policy was consistent with the history of hiring practices at Seaboard. Prior to 1985, neither Seaboard nor Saticoy had a system whereby applicants could apply for specific jobs. Rather, employees would be assigned to particular jobs by the various supervisors. During this time, there were no female general laborers and the employees in the grader and carton former classifications were all women. The discriminatory nature of the sex segregated job classifications at Seaboard and Seaboard was publicized by the union during the several months prior to the Seaboard–Saticoy merger. Saticoy's discriminatory intent may be inferred from the fact that Saticoy persisted in similar hiring practices after the merger even though the discriminatory implications of Seaboard's hiring practices had been made known to the company. *E.E.O.C. v. Inland Marine Industries,* 729 F.2d 1229 (9th Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83

L.Ed.2d 114 citing *Local 189, United Papermakers & Paperworkers of United States,* 416 F.2d 980, 997 (5th Cir.1969) (per Wisdom, J.), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

The Court finds that the plaintiffs Sofia D. Gonzales, Sara Alvarez, and Rosemary N. Madrid have met their burden under *McDonnell–Douglas* of showing that Saticoy's hiring policy was premised "on a discriminatory criterion illegal under [Title VII]." *Int'l Bro. of Teamsters v. United States,* 431 U.S. at 359, 97 S.Ct. at 1866. The stark statistical patterns in hiring, the anecdotal evidence of discriminatory remarks, and the disparate treatment of the applications of men and women who were willing to do "any" work support an inference of classwide, systematic discrimination in hiring.

The defendant failed to present a convincing rebuttal. Without any legitimate business purpose, Saticoy refused to hire women for the traditionally male general labor jobs and instead hired women only for those jobs characterized as "women's jobs". Although women were qualified and interested in these jobs, they were passed over for men. While Saticoy's hiring policy was not conspiratorial, it was not accidental and therefore was in violation of Title VII. *See Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757 (9th Cir.1980).

As the Sixth Circuit noted in *Marsh v. Eaton,* 639 F.2d 328, 330 and n. 2 (6th Cir.1981), "the fact that female employees did not attempt to bid out of these jobs is not relevant to the claim of improper channeling in initial placement." The Court concludes that Saticoy treated women applicants in a discriminatory fashion as its "standard operating procedure". *Int'l Bro. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. at 1854–55 and n. 15. Saticoy produced no evidence of a legitimate, nondiscriminatory reason for its hiring decisions to rebut the plaintiffs' *prima facie* case. Accordingly, the Court finds that the defendant violated Title VII and California state law in its hiring practices after its merger with Seaboard.

Disparate Impact of Saticoy's 1985 Post–Merger Decisions

 To establish a prima facie case of disparate impact, a plaintiff must show that a particular policy or practice neutral on its face actually operated to the disadvantage of a protected minority group. *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Subjective or discretionary employment practices may be analyzed under a disparate impact theory. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Generally, the evidence "focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Id.*

 The plaintiffs proved at trial that Saticoy's post-merger decisions in December 1985 to hire only those employees actively working at the Seaboard plants, to assign them to the same jobs they held at Seaboard, and to cut-off the recall rights of all other ex-Seaboard employees had a disparate impact on women. Since fewer women were employed at Seaboard at the time of the merger and more female employees were on layoff, it was inevitable that Saticoy's decision would impact the female Seaboard employees more harshly. The plaintiffs' expert, Thomas DiPrete, showed that if Saticoy had followed Seaboard seniority, 71% of those hired would have been women and 29% men; instead, 77% of those hired were men and 23% women. Similarly, Saticoy's decision to give no preferential consideration to ex-Seaboard employees in hiring disproportionately impacted the female employees. In 1986, Saticoy hired 45 general laborers, 44 of whom were men. If Saticoy had followed seniority in hiring, approximately 38 (84%) of these jobs would have gone to women.

A policy which adversely affects a protected group may still be lawful if "the challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove Packing v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In *Wards Cove,* the

Supreme Court held that the practice did not have to be "essential" or "indispensable" to survive scrutiny under a disparate impact analysis. *Id.*

After the merger, Saticoy closed plant 5 for renovation and immediately began to hire workers for plant 4. Saticoy maintained at trial that its decisions immediately after the merger were pursuant to a legitimate goal of getting experienced workers into plant 4 as quickly as possible in order to process and pack the perishable fruit in storage. Although Saticoy could have chosen to hire from its own workforce and employees on layoff from the Saticoy plants, Saticoy believed that following its normal policy of opening up jobs to its own employees first would be time-consuming and cumbersome given the large number of jobs available. For this reason, Saticoy decided to use the Seaboard seniority list and hire as new employees those employees working at Seaboard on December 20, 1985, provided they applied for work at Saticoy. If Saticoy had hired strictly by seniority, the women comprising the additional workforce would have been unskilled and inexperienced for the tasks that they would be asked to perform. Saticoy would have been unable to meet the demands of the exigent circumstances which mandated the immediate hiring if it had been forced to train one-third of its workforce in new jobs.[13]

In rebuttal to the defendant's evidence of a legitimate business justification for its post-merger decisions, the plaintiffs attempted to argue that the general labor jobs required virtually no skill and did not need to be filled only by men who had previously held the jobs. However, contrary to the plaintiffs' position, the Court finds that Saticoy had certain business needs which required an immediate experienced workforce in plant 4. There is no evidence that Saticoy hired men over women for jobs which women had held while the plant was operated by Seaboard. Rather, Saticoy simply transferred to a large extent the existing workforce at Seaboard

to Saticoy. Saticoy's decisions regarding the Seaboard employees in December 1985 were justified in light of Saticoy's business needs and do not warrant a finding of discrimination.

Saticoy's Duty to Remedy Effects of Seaboard's Prior Discrimination

The plaintiffs argued at trial that in light of Saticoy's knowledge that women had been subject to systematic discrimination at Seaboard, the company had a duty to remedy the effects of this discrimination when it took over the Seaboard plants. With the knowledge that Seaboard had assigned employees to jobs segregated by sex and had retained new and junior male employees while laying off senior women, Saticoy was not free to continue the job assignments and work rules that had been established at Seaboard. As a matter of law, however, this theory must fail.

Under Title VII, an employer has an obligation to maintain non-discriminatory policies and to afford equal opportunities to all employees. However, contrary to the plaintiffs' contention, absent a presently existing discriminatory policy, there is no affirmative duty to remedy the present effects of past discrimination. The plaintiffs confuse an employer's duty not to adopt discriminatory practices with a duty to remedy residual discrimination which is not the result of any existing discriminatory policy. Where no present discriminatory policy exists, an employer is not liable or required to remedy the continuing effects of prior discrimination. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

The cases upon which the plaintiffs rely to establish such an affirmative duty are all distinguishable because the employers actively continued to discriminate, *See e.g. Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), or failed to remove the discriminatory effects of wrongful discrimination which existed before the passage of Title VII and which the

---

**13.** Even if Saticoy had hired general laborers in 1986 according to Seaboard seniority and without reference to former Seaboard job classifica-

tions, none of the four plaintiffs would have had sufficient seniority to be hired in 1986.

defendant had perpetuated. *See e.g. Chrapliwy v. Uniroyal, Inc.,* 458 F.Supp. 252 (N.D.Ind.1977). In *Bazemore v. Friday,* the Supreme Court held that an employer had a duty to eliminate discrimination even if it resulted from the continuation of practices established before the implementation of Title VII. In *Bazemore,* the defendant maintained a racially divided workforce; subsequent to the date that Title VII was made applicable to public employees, the defendant merged the workforce but continued to pay black employees less than white employees. The Supreme Court found that the defendant had to remedy the effects of pre-Title VII discrimination because the defendant had continued to discriminate against the black employees after the promulgation of Title VII. As the *Bazemore* Court noted, "[a] pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under [Title VII]." *Id.* 478 U.S. at 395, 106 S.Ct. at 3006. Absent continued discrimination by an employer, however, Title VII imposes no duty to remedy past discrimination. Title VII under no circumstances requires an employer to give preferential treatment to minorities or women as the result of past discrimination. 42 U.S.C. sec. 2000e–2(j); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 at 259, 101 S.Ct. 1089 at 1096, 67 L.Ed.2d 207.

The evidence at trial demonstrated that Seaboard employed discriminatory practices prior to its acceptance of a collective bargaining agreement in December 1985. By asserting this theory, the plaintiffs appear to be trying to establish a safety net in the event their other claims fail. At a minimum, the plaintiffs ask this Court to find that Saticoy must ensure that all of the lingering segregation and discrepancies between the male and female workforce resulting from Seaboard's discriminatory practices are eradicated.

**14.** Because the liability and damages issues were bifurcated, the Court does not reach the

Since the Court has found that Saticoy violated Title VII with regard to its hiring practices, the defendant is already obligated to remedy that discrimination. Like Seaboard, Saticoy consistently channeled newly hired men and women into job classifications which had been segregated by sex for years. Consequently, Saticoy has a legal obligation to amend its hiring practices and provide the plaintiffs and class members with appropriate relief.[14] To the extent that the plaintiffs assert this theory to ask for relief from the discrimination resulting from Seaboard's and Saticoy's hiring practices, their claim is duplicative and need not be considered.

The Court has not addressed the merits of Saticoy's policies toward its employees because the plaintiffs failed to timely file their charges challenging these practices. Therefore, the Court has not made any findings regarding the alleged discriminatory impact of those policies. Absent a finding that Saticoy presently discriminates in its employment policies, the defendant has no duty to remove all traces of the discriminatory effects of Seaboard's discrimination prior to the merger.

### CONCLUSION

To summarize, the Court finds that only the claims of Sofia D. Gonzales, Sara Alvarez, and Rosemary N. Madrid are viable. The plaintiffs' claim that Saticoy's work assignment practices disparately impacted women is time-barred and thus the Court does not reach the merits of this issue. Saticoy adequately rebutted the plaintiffs' *prima facie* case of disparate impact with regard to the defendant's post-merger decisions. Similarly, the plaintiffs' claim that Saticoy had a duty to remedy Seaboard's prior discrimination against female employees is legally untenable. However, the Court finds that Saticoy did in fact discriminate in its hiring practices on the basis of sex, thereby violating both Title VII and California state law.

merits of the appropriate relief at this stage of the trial.

The award and calculation of any monetary relief will be determined in a future proceeding. A finding of a violation of Title VII, however, almost always justifies the issuance of an injunction against the discriminatory practice absent changed circumstances that would render an injunction inappropriate. Therefore, in order to facilitate the determination of appropriate injunctive relief, the parties are hereby ordered to submit briefs suggesting guidelines for an injunction and any legal basis for the particular relief sought. The briefs should be filed no later than October 1, 1990.

It is so ORDERED.